UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

JACOB DASKAL,

Defendant.

**SEALED
MEMORANDUM & ORDER
21-CR-110 (NGG) (LB)**

NICHOLAS G. GARAUFIS, United States District Judge.

Before the court are six motions *in limine* submitted by the Government, (Gov't Mot. (Dkt. 97), two motions *in limine* submitted by Defendant Jacob Daskal, (Def's. Mot. (Dkt. 99), and a *Daubert* motion submitted by Daskal. (Daub. Mot. (Dkt. 110).) Both parties opposed each other's motions. (Gov't Opp. (Dkt. 117); Def's. Opp. (Dkt. 119); Daub. Opp. (Dkt. 121).) For the following reasons, the Government's motions *in limine* are GRANTED IN PART, DENIED IN PART, and RESERVED IN PART, Daskal's motions *in limine* are GRANTED IN PART and DENIED IN PART, and Daskal's *Daubert* motion is GRANTED IN PART and DENIED IN PART.[1]

## I.   BACKGROUND

The court assumes the parties' familiarity with the Government's theory of this case, which charges Daskal with one act of Coercion and Enticement pursuant to the Mann Act, 18 U.S.C. §§2422(b) and 3551 *et seq.*, and one count of Transportation of a Minor with Intent to Engage in Criminal Sexual Activity, 18 U.S.C. §§2423(a) and 3551 *et seq.* (*See generally Superseding Indictment* (Dkt. 96).) Jury Selection is set to begin July 17, 2023.

---

[1] The court will respond to the remaining outstanding motions in short order.

## II. STANDARD OF REVIEW

"The purpose of an in limine motion is to aid the trial process by enabling the court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996).[2] "A court will exclude evidence on a motion in limine only if it is clearly inadmissible on all potential grounds." *Laureano v. City of New York*, No. 17-CV-181 (LAP), 2021 WL 3272002, at *1 (S.D.N.Y. July 30, 2021). "[C]ourts considering a motion in limine may reserve decision until trial, so that the motion is placed in the appropriate factual context." *Ohio Cas. Ins. Co. v. Twin City Fire Ins. Co.*, No. 14-CV-858 (NGG) (PK), 2019 WL 1365752, at *2 (E.D.N.Y. Mar. 26, 2019). At trial, the court may also exercise discretion "to alter a previous in limine ruling." *Luce v. United States*, 469 U.S. 38, 41-42 (1984).

## III. THE GOVERNMENT'S MOTIONS *IN LIMINE*

### A. Complaining Witness's Anonymity

The Government moves, under 18 U.S.C. § 3509(d)(3)(A), for an order of protection permitting the Complaining Witness to testify under only her first name, requiring the parties to refer to her by first name during trial and any ancillary proceedings, requesting the redaction of pertinent transcripts, and mandating that all parties be precluded from publishing documents that reflect her full name at trial. (Gov't Mot. at 6-9.) The Defendant opposes this motion, countering that "[r]eferring to Jane Doe by just her first name would unduly prejudice Mr. Daskal." (Def's Mot. at 7-9.)

---

[2] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

1. Legal Framework

18 U.S.C. § 3509, under which the Government moves for a protective order, provides a host of options for protecting the rights of child victims and child witnesses at trial. The specific provision at issue here, § 3509(d)(3)(A), states: "[o]n motion by any person the court may issue an order protecting a child from public disclosure of the name or any other information concerning the child in the course of the proceedings, if the court determines that there is a significant possibility that such disclosure would be detrimental to the child." 18 U.S.C. § 3509(d)(3)(A).

Although § 3509 itself pertains solely to minor victims and witnesses, minor victims of sexual assault are far from the only witnesses that courts permit to testify under a pseudonym or with some other form of identity protection.[3] In assessing whether a witness's identity should be protected, courts weigh the testifying witness's interest in anonymity against the defendant's due process and cross examination rights, as well as the rights of the public and the press to access the trial.

The Sixth Amendment's Confrontation Clause guarantees defendants the right to cross-examine adverse witnesses. U.S. Const. amend VI; *see also Delaware v. Van Arsdall*, 475 U.S. 673,

---

[3] Courts also seem to have considered the principles underlying § 3509 in scenarios in which adults are testifying about events that occurred when they were minors and permitted such witnesses to testify using a pseudonym. *See United States v. Maxwell*, No. 20-CR-330 (AJN) (S.D.N.Y.), Tr. of Nov. 1, 2021, (Dkt. 465), at 7 ("It is quite common for alleged victims, both in cases that have garnered media attention and those involving allegations of sex abuse, to testify or be referred to by pseudonyms or first names. Courts have allowed this whether or not the alleged victims are minors or adults *or adults testifying about abuse that allegedly occurred when they were minors*") (emphasis added); *see also United States v. Dupigny*, No. 18-CR-528 (JMF) (S.D.N.Y.), Tr. of Oct. 17, 2019, (Dkt. 198), at 32; *United States v. Gardner*, No. 16-CR-20135 (GAD), 2016 WL 5404207, *5-6 (E.D.M.I Sept. 28, 2016).

678 (1986) ("[T]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.") (emphasis in original). This includes the right to "ask the witness who he is and where he lives" because these questions are "the very starting point in exposing falsehood and bringing out the truth through cross-examination." *Smith v. Illinois*, 390 U.S. 129, 131 (1968). Nevertheless, "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679. The court "should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611(a); *see also United States v. Whitten*, 610 F.3d 168, 182-83 (2d Cir. 2010).

The Second Circuit has identified two "central interests" defendants have in the public airing of identifying information about witnesses. *See United States v. Marti*, 421 F.2d 1263, 1266 (2d Cir. 1970) (discussing *Smith* and *Alford v. United States*, 282 U.S. 687 (1931)); *see also United States v. Raniere*, No. 20-CR-352, 2022 WL 17544087, at *6 (2d Cir. Dec. 9, 2022). First, the defense may require testimony about the witnesses' identity, such as their full name or address, "so that the defense can obtain this information which may be helpful in investigating the witness out of court or in further cross-examination." *Id.* "Second, the defense may need the witness to reveal [identifying information] because knowledge [of that information] by the jury might be important to its deliberations as to the witness' credibility or his knowledgeability." *Id.*

When the government "seeks to limit disclosure of identifying information in open court," it "must provide a reason for the limitation." *United States v. Marcus*, No. 05-CR-457 (ARR), 2007

WL 330388, at *1 (E.D.N.Y. Jan. 31, 2007) (citing *Marti*, 421 F.2d at 1266). This reason "may be that the answer may subject the witness to reprisals or that the question is being used to humiliate or annoy the witness." *Id.* (quoting *Marti*, 421 F.2d at 1266). Once the government has provided a valid reason, the defendant must "demonstrate a particularized need for disclosure of the relevant information, which the court weighs against the risks to the witness." *Id.* (citing *United States v. Bennett*, 409 F.2d 888, 901 (2d Cir. 1969) and *United States v. Cavallaro*, 553 F.2d 300, 305 (2d Cir. 1977)).

Relatedly, "the press and general public have a constitutional right of access to criminal trials," *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 603 (1982), which counsels in favor of full disclosure of a witness's identity. This right, however, "is not absolute" and may be curtailed in limited circumstances. *Id.* at 606. In order to limit public access to a criminal trial, the Government must show that the proposed limitation is "necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Id.* at 606-07.

On the other hand, in assessing the weight of the witness's interest in some kind of limitation, courts in this Circuit have considered a wide range of factors such as the witness's safety, their need for protection from harassment, potential loss of employment, the explicit nature of likely testimony, whether the witness's concerns are generalized and speculative or actual and particular, whether alleged victims were children at the time of the sexual abuse, and the likelihood of significant media coverage. *See United States v. Dan Zhong*, No. 16-CR-614 (DLI), 2018 WL 6173430, at *1-2 (E.D.N.Y. Nov. 26, 2018) (agreeing to protective measures for victim-witnesses and their testifying family members because "the victims and/or their families potentially face[d] reprisals for their testimony" and the "Defendant's need for the identity of the victim witnesses [did] not outweigh the

concerns raised as to the safety of those witnesses" as their "true names and identities [were] immaterial to Defendant's guilt or innocence"); *United States v. Paris*, No. 06-CR-64 (CFD), 2007 WL 1484974, at \*2 (D. Conn. May 18, 2007) (permitting pseudonymous testimony where "the interests of the Government, the Jane Does and the Minors in protecti[on] . . . from the likely adverse personal, professional and psychological consequences of publicly linking their identities to their past lives as sex workers [were] legitimate and substantial"); *United States v. Maxwell*, No. 20-CR-330 (AJN) (S.D.N.Y.), Tr. of Nov. 1, 2021, (Dkt. 465), at 10 (finding "good reasons to limit public disclosure" of a witness's identifying information in a highly publicized trial where "[t]he government anticipate[d] that the alleged victims [would] testify in explicit detail and/or be the subject of highly sensitive and personal testimony concerning illegal sexual abuse"); *see also Ray*, 2022 WL 558146, at \*28.

Courts in this Circuit have also acknowledged the pain and attendant social stigma that is often endured by those who come forward with allegations of sexual assault or abuse. As a result, courts have held that public policy considerations favor granting protective orders to alleged victims of sexual assault, and young victims of sexual assault in particular, to "encourag[e] crime victims to testify by protecting them from the adverse consequences of testifying." *United States v. Thompson*, 178 F. Supp. 3d 86, 96 (W.D.N.Y. 2016). Indeed, "[t]he practice [of allowing alleged victims of sexual abuse to testify under a pseudonym] has been widely permitted because requiring alleged victims to publicly provide their names could chill their willingness to testify for fear of having their personal histories publicized[]" and "may cause further harassment or embarrassment[.]" *United States v. Maxwell*, No. 20-CR-330 (AJN) (S.D.N.Y.), Tr. of Nov. 1, 2021, (Dkt. 465), at 7-8; *see also United States v. Raniere*, No. 18-CR-204 (NGG), May 6, 2019 Memorandum & Order, (Dkt. 109), at 32.

### 2. Analysis

The Government has obvious interests in limiting disclosure of the Complaining Witness's identity under the standard set forth in *Marti*. These include, but are not limited to, (1) encouraging putative survivors of child sexual abuse to come forward, and thus protecting other minors from experiencing further harm, *see Globe Newspaper Co.*, 457 U.S. at 607, and (2) preventing potential "adverse personal, professional and psychological consequences" to a still very young woman in response to a harm that was allegedly inflicted while she was a minor. *See Paris,* 2007 WL 1484974, at *2. The Defense argues this second reason is improperly speculative, as the Government has not identified specific instances of negative consequences felt by the Complaining Witness relating to her allegations. (Def's. Opp. at 8.) But the court is not persuaded by this logic, as it has already been made aware that the Complaining Witness has suffered serious social ostracization due at least in part to her allegations against Daskal. (*See* Ex. A to Def's. Opp. (Dkt. 119-1).)[4][5] Moreover, the Government's interest in protecting the Complaining Witness from such

---

[4] When deciding preliminary questions of admissibility, the "court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a). Thus, even if the source of this information is inadmissible and cannot be presented to the jury, it may properly be relied upon in making other *in limine* admissibility determinations.

[5] In his Opposition to the Government's Motion, Daskal relies heavily on a 2022 order on motions *in limine* by Judge Liman in *Ray*, 2022 WL 558146. (*See, e.g.,* Def's. Opp. at 7-8.) Although the crimes alleged in *Ray* bear some similarity to those alleged here, the order cited by Daskal deals with quite a different question: whether to allow a victim of fraud and extortion, not a purported victim of child sexual assault, to testify using a pseudonym. *Id.* at *27. Notably, Judge Liman distinguished the facts relating to the victim under discussion in *Ray* from two cases regarding sexual abuse of minors, *United States v. Kelly*, No. 19-CR-286 (AMD) (E.D.N.Y. Nov. 4, 2021) and *Paris*, 2007 WL 1484974, at *2. *See id.* at *29. Finally, in *Ray*, there was an insinuation that the goal of the requested protective order was to "make

harms is heightened by her young age at the time of the alleged abuse. *See United States v. Dupigny*, No. 18-CR-528 (JMF) (S.D.N.Y.), Tr. of Oct. 17, 2019, (Dkt. 198), at 32 (seeking to "preserve[] the privacy of the victims," in part because the conduct occurred when they were minors).

Nor is the Government's proposed curtailment of public and press access improper. The reasons stated above also provide a sufficient "compelling government[al] interest" under *Globe Newspaper Co.*, 457 U.S. at 606-07. Moreover, the Government's requested limitation on access—non-disclosure of the Complaining Witness's last name—is narrowly tailored because the press and public will be able to see and hear her testify and be present for the entirety of trial. As such, withholding identifying information in the manner proposed by the Government is but a "minor abridgement of the public interest in being able to engage in informed discussion of governmental affairs." *Paris*, 2007 WL 1484974, at *2.

Daskal argues the Complaining Witness's interest in protecting her identity is negated by the fact that her name and allegations are already known to at least some members of the "close knit ultra-orthodox community in New York." (Def's. Opp. at 8.) That fact is, in this court's view, immaterial. The differences between rumors circulating within a specific community and detailed testimony in a highly publicized criminal trial cannot be ignored. *See United States v. Raniere*, No. 18-CR-204 (NGG), May 6, 2019 Memorandum & Order, (Dkt. 109), at 34 n. 17 ("[The defendant] points to the media attention already present in this case to argue that there is no need to protect the victims' identities. . . . Whether true or not, these facts are irrelevant; just because some

---

the [g]overnment's job easier" by convincing the victim witness to testify. *Id.* at *28. Such is not the case here, where there has been no insinuation whatsoever that Jane Doe would recant her testimony or refuse to take the stand, were the Government's request to be denied.

victims' names are publicly available does not mean that the details of their experience are already available. Further, the choice of a victim to publicly discuss a crime is not analogous to being put on the stand about it[.]"); *United States v. Maxwell*, No. 20-CR-330 (AJN) (S.D.N.Y.), Tr. of Nov. 1, 2021, (Dkt. 465), at 9 ("Nor am I persuaded by the defense's arguments that the fact that some alleged victims have previously publicly disclosed some of their allegations obviates the need to limit disclosure. . . . Deciding to participate in or contribute to a criminal investigation or prosecution is a far different matter than simply making a public statement relating to [the defendant].").

In addition, the proposed remedy does not impair the Defendant's Sixth Amendment confrontation rights whatsoever. Daskal knows the Complaining Witness's name and is free to undertake whatever research he sees fit in advance of trial. Indeed, the court is aware that he has already sought and obtained information about the Complaining Witness for use on cross-examination. Allowing the Complaining Witness to testify under her first name creates no impediment to any efforts to identify impeachment evidence. Thus, the court finds that withholding identifying information about the Complaining Witness from the public where the defendant already knows the Complaining Witness's true identity, "will not impair the [d]efendant's ability to cross-examine the [alleged v]ictim." *United States v. Graham*, No. 14-CR-500 (NSR), 2015 WL 6161292, at *10 (S.D.N.Y. Oct. 20, 2015).[6]

Daskal contends that he will be prejudiced by allowing the Complaining Witness to testify by first name only because doing so would "improperly lend[] credence to Jane Doe's allegations against Mr. Daskal" and attaching to him an aura of dangerousness in front of the jury, thereby subverting the presumption of

---

[6] There is also no indication that the disclosure of the Complaining Witness's last name would "be important to [the jury's] deliberations as to the witness' credibility or his knowledgeability." *Marti*, 421 F.2d at 1266.

innocence. (Def's Opp. at 7.) The court believes that an appropriate limiting instruction could ameliorate the potential for bias arising from such an accommodation for the Complaining Witness. In an abundance of caution, however, the court now modifies the accommodation requested by the Government, and rather than permitting the Witness to testify by first name only, instead offers a similarly protective accommodation that reduces the risk of any prejudice to Daskal. The Complaining Witness will be permitted to testify under her first name and a pseudonymous last name. This solution speaks to both parties' concerns. The parties are also DIRECTED to ensure the Complaining Witness's use of a pseudonym is not made known to the jury. *See, e.g., United States v. Asainov*, No. 19-CR-402 (NGG), Memorandum & Order of Jan. 13, 2023, (Dkt. 122), at 27.[7]

Lastly, the Defendant raises legitimate concerns about the potential "risk to the integrity of the trial itself" if the court is unable to mention the Complaining Witness's full name during voir dire and receive "assurance that [no] member of the jury will [] be

---

[7] The Defense further argues that issues may arise if either party calls a member of the Complaining Witness's family to testify. (Def's. Opp. at 8.) This issue is easily dispensed with. If either party calls any member of the Complaining Witness's family as a witness, that family member can also testify under the pseudonymous last name assigned to the Complaining Witness. *See Maxwell*, No. 20-CR-330 (AJN), Tr. of Nov. 1, 2021, at 8 ("Limiting the disclosure of [the identities of certain witnesses who are not alleged victims themselves] furthers [] important interests because the disclosure of their identities would necessarily reveal the identities of the alleged victims"); *United States v. Portefield*, No. 20-CR-42-A, 2022 WL 16918163, at *1-2 (W.D.N.Y. Nov. 14, 2022) (granting the government's request for a protective order that required a minor victim's mother who shared the same last name as the minor victim and was expected to testify at trial be referred to by first name and last initial rather than by her full name, to avoid public identification of the victim). To the extent that witnesses called to testify about the Complaining Witness or her family find it difficult to remember to use the pseudonymous last name, those witnesses can be directed to use first names only.

seated who knows or is familiar with" the Complaining Witness.
(Defs. Opp. at 7 (quoting *Ray*, 2022 WL 558146 at *28).) These
concerns can be alleviated through careful management of the
logistics of voir dire. The parties are thus DIRECTED to work with
Judge Bloom to use the "list method," employed by Judge Na-
than in the highly publicized trial of Ghislaine Maxwell, among
others. *See United States v. Maxwell*, No. 20-CR-330 (AJN)
(S.D.N.Y.), Tr. of Nov. 1, 2021, (Dkt. 465), at 13. During jury
selection, potential jurors will be given a list of all pseudonymous
and non-pseudonymous names relevant to the trial, without any
indication of the nexus between any given individual names and
the case, and will be excluded from the jury based on familiarity
with any individual identified on the list.[8]

For the reasons set forth above, the Government's motion is
GRANTED AS MODIFIED. The court will redact pertinent tran-
scripts accordingly and the parties will not be permitted to
publish documents reflecting her full name at trial.

### B.    Excluding Evidence Under Rule 412

The Government moves to preclude Daskal from offering evi-
dence of and/or arguments about the Complaining Witness's
involvement in any other sexual behavior. (Gov't Mot. at 9.)

Under Rule 412, evidence offered to prove that a victim engaged
in other sexual behavior or to prove their sexual predisposition is
inadmissible in a civil or criminal proceeding involving alleged
sexual misconduct. Fed. R. Evid. 412(a). This Rule "aims to safe-
guard the alleged victim against the invasion of privacy, potential

---

[8] In *United States v. Maxwell*, the government described the "list method"
ultimately approved by the court as follows: "At voir dire, prospective ju-
rors can be given a sheet of paper with the true names and pseudonyms of
the protected witnesses and asked whether they know any individuals on
the paper . . . Accordingly, the Court and parties may screen for juror bias
without requiring any juror to state a protected name in open court." No.
20-CR-330, Government's Motion *in Limine*, (Dkt. 380), at 15 n.5.

embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into the factfinding process." Fed. R. Evid. 412 advisory committee's note to 1994 amendment. There are three exceptions to this general rule in criminal cases:

> (A) evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence;

> (B) evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecutor; and

> (C) evidence whose exclusion would violate the defendant's constitutional rights.

Fed. R. Evid. 412(b)(1). In effect, Rule 412 "does not exclude evidence of sexual conduct included in, intrinsic to, and inextricably intertwined with that charged in the indictment." *United States v. Frey*, No. 19-CR-537 (DRH) (SIL), 2022 WL 2359665, at *5 (E.D.N.Y. June 30, 2022); *see also United States v. Raniere*, No. 18-CR-204-1 (NGG) (VMS), 2019 WL 2163189, at *3 (E.D.N.Y. May 16, 2019) (noting that evidence of "behavior in engaging in the sexual acts at issue here" was outside the scope of Rule 412).

The constitutional rights "contemplated by [the third] exception include the accused's right under the Sixth Amendment to confront witnesses[,] which includes a meaningful opportunity to present a complete defense at trial, and to confront a witness, including by impeaching the credibility of a prosecution witness by cross-examination." *United States v. Rivera*, 799 F.3d 180, 184-85 (2d Cir. 2015). This exception does not cover evidence that is not relevant for the defense put forth. *See id.* at 188 (noting that

the district court had not erred in excluding evidence of the victims' prior acts of commercial sex because such evidence was irrelevant to whether those victims were coerced into working as prostitutes by the defendants); *Frey*, 2022 WL 2359665, at *5 ("[The defendant] asks the Court not to find inadmissible Jane Does' broader, more general sexual history (including time periods and locations) with other clients. [The defendant's] constitutional rights are not implicated by this evidence.").[9]

A party intending to offer evidence under Rule 412(b) must also abide by the following procedures:

> (A) file a motion that specifically describes the evidence and states the purpose for which it is to be offered;
>
> (B) do so at least 14 days before trial unless the court, for good cause, sets a different time;
>
> (C) serve the motion on all parties; and
>
> (D) notify the victim or, when appropriate, the victim's guardian or representative.

Fed. R. Evid. 412(c)(1). Before admitting evidence subject to a Rule 412(b)(1) exception, "the court must [also] conduct a sealed *in camera* hearing and give the victim and parties a right to attend and be heard." Fed. R. Evid. 412(c)(2).

Daskal argues that wholesale exclusion of evidence regarding the Complaining Witness's prior sexual history is inappropriate at this time because the Government has not specified what particular evidence it seeks to exclude. (Def's. Opp. at 9.) The court agrees. While Rule 412 generally bars admission of a victim's sexual history in criminal proceedings, it does allow for such

---

[9] Evidence that is not excludable under Rule 412 may still be inadmissible under Rule 403. *See United States v. Ray*, No. 20-CR-110 (LJL), 2022 WL 729861, at *1 (S.D.N.Y. Mar. 10, 2022).

evidence to be introduced in certain specific instances. Without any information regarding the particular evidence the Government seeks to exclude, or that Daskal seeks to introduce, the court cannot determine whether this is such an instance. The court thus RESERVES JUDGEMENT on the Government's second motion *in limine*. The court will rule on this motion, where appropriate, consistent with the principles described above.[10]

### C.    Admission of the Complaining Witness's Prior Consistent Statements

The Government next seeks admission of various out-of-court statements made by the Complaining Witness as prior consistent statements under Rule 801(d)(1)(B). This Rule provides that "[a] statement . . . is not hearsay" where "[t]he declarant testifies and is subject to cross-examination about a prior statement," and that statement:

> (B) is consistent with the declarant's testimony and is offered:
>
>> (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or
>>
>> (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground[.]

Fed. R. Evid. 801(d)(1)(B). This Rule "was amended in 2014 to include subsection (ii), which expands the purposes for which

---

[10] The court notes, however, that Daskal is bound by the procedures specified in Rule 412(c) for introducing such evidence, including disclosure of the specific evidence at issue and its purpose at least 14 days before trial, unless the court sets a different time for good cause. *See* Fed. R. Evid. 412(c). The court has yet to receive such notice and jury selection is scheduled to begin on July 17, 2023.

prior consistent statements may be offered." *United States v. Purcell*, 967 F.3d 159, 196 (2d Cir. 2020). "The intent of the amendment is to extend substantive effect to consistent statements that rebut other attacks on a witness -- such as the charges of *inconsistency or faulty memory*." Fed. R. Evid. 801 advisory committee notes to 2014 amendment (emphasis added); *see also Purcell*, 967 F.3d at 196.[11] That said, prior consistent statements cannot be offered to rebut "only a generalized attack on credibility." *United States v. Pierre*, 781 F.2d 329, 333 (2d Cir. 1986). "The prior consistent statement [] must have 'some rebutting force beyond the mere fact that the witness has repeated on a prior occasion a statement consistent with his trial testimony.'" *See also United States v. Ray*, No. 20-CR-110 (LJL), 2022 WL 558146, at *5 (S.D.N.Y. Feb. 24, 2022) (quoting *Pierre*, 781 F.2d at 331). The 2014 amendment did not alter the well-accepted principle that Rule 801(d)(1)(B) "does not allow impermissible bolstering of a witness." *See* Fed. R. Evid. 801 advisory committee notes to 2014 amendment; *see also Tome v. United States*, 513 U.S. 150, 157-58 (1995) ("[Rule 801(d)(1)(B)] speaks of a party rebutting an alleged motive, not bolstering the veracity of the story told.") In addition, admissibility under Rule 801(d)(1)(B) requires that a statement was "made before the charged recent fabrication or improper influence or motive." *Tome*, 513 U.S. at 167; *accord United States v. Caracappa*, 614 F.3d 30, 39 (2d Cir. 2010).

The Government seeks to introduce the following statements, among others, under Rule 801(d)(1)(B) at trial: (1) statements the Complaining Witness made to a friend in Chicago purportedly disclosing her sexual relationship with Daskal; (2) statements Complaining Witness made to a mentor regarding her

---

[11] Statements admissible under Rule 801(d)(1)(B) can be used for substantive purposes, as well as to rehabilitate a witness, whether admissible under subsection (i) or (ii). *Purcell*, 967 F.3d at 196.

allegations against Daskal; and (3) a written statement Complaining Witness gave to a friend in June 2018 also about her allegations against Daskal. (Gov't Mot. at 15-17; Gov't Opp. at 6-7.) Daskal argues that admission of these statements under Rule 801(d)(1)(B) is improper because they were made after a motive to fabricate arose and because they constitute impermissible bolstering. (Def's. Opp. at 3-5.)

A ruling on this motion *in limine* is premature at this time. Prior consistent statements may be admissible once a witness's credibility is attacked during cross-examination, or during the opposing party's opening arguments to the jury. *See Ray*, 2022 WL 558146, at *6; *see also United States v. Flores*, 945 F.3d 687, 705-06 (2d Cir. 2019); *United States v. O'Connor*, 650 F.3d 839, 862-63 (2d Cir. 2011). Here, the parties have not yet opened, the Complaining Witness has not yet testified, and Daskal has not yet sought to impeach her credibility. Until then, the court cannot determine whether the requirements of Rule 801(d)(1)(B) have been satisfied for any of the three categories of statements that the Government seeks to introduce. At trial, the Government may seek admission of a prior consistent statement once the Rule 801(d)(1)(B) requirements for that specific statement are met. The court will not admit prior consistent statements used for impermissible bolstering. *See* Fed. R. Evid. 801 advisory committee's note to 2014 amendment.

If, at trial, Daskal maintains his objection to admission of these statements on the basis that they were made *after* a motive to fabricate arose, he bears the burden of articulating the timing of when the specific motive at issue developed. The court notes that Daskal's briefing provides conflicting theories of a motive to fabricate. (*See* Def's. Opp. at 4.) Daskal suggests first that a motive developed after Jane Doe complained to the NYPD and Daskal was arrested, but later that "any motive [the Complaining Witness] may have had to fabricate" was well entrenched after she

made denials and inconsistent statements regarding her allegations in the fall of 2017 and winter of 2018. (*Id.*) At trial, Daskal would need to articulate a clearer theory of fabrication—and one that provided a motive to fabricate testimony rather than to lie generally, *see Tome*, 513 U.S. at 158 ("Impeachment by charging that *the testimony is a recent fabrication or results from an improper influence or motive* is . . . capable of direct and forceful refutation through introduction of out-of-court consistent statements that *predate the alleged fabrication, influence, or motive*") (emphasis added),— to successfully object to the admission of prior consistent statements on this basis. Courts in this circuit have found a motive to fabricate after the witness or the witness's co-conspirator has interacted with law enforcement or been arrested. *See, e.g., United States v. Al-Moayad*, 545 F.3d 139, 167 (2d Cir. 2008). ("[The witness] created the [statements] after a significant motive to fabricate arose, namely the large amount of money he expected and was paid to furnish information to the FBI."); *United States v. Dixon*, 511 F. App'x 48, 53 (2d Cir. 2013) (Summary Order) ("[T]he motive to fabricate alleged by the prosecution at trial—[the witness's] feelings of guilt about reporting [the defendant] to the police and pressure from [the defendant's] family to take the blame—had already arisen at the time these statements were made."); *United States v. Forrester*, 60 F.3d 52, 64 (2d Cir. 1995) (finding a motive to fabricate "as soon as" the witness was arrested); *United States v. Zapata*, 356 F. Supp. 2d 323, 328 (S.D.N.Y. Feb. 10, 2005) ("[The witness's] motive to fabricate at the time he made the prior consistent statement, after his arrest while explaining the crime to the police, was the same—he wanted to protect Zapata."). These are by no means, however, the only situations in which such a motive could exist.

The court thus RESERVES JUDGEMENT. The court will address motions to admit prior consistent statements at trial in the manner described herein.

### D.     Disclosure of the Consequences of Conviction

The Government also seeks to preclude evidence of Daskal's potential punishment after trial. (Gov't Mot. at 19.) The Government asserts that such evidence is irrelevant, would mislead the jury, and would result in prejudice and confusion. (*Id.*) Daskal has not filed an objection to the Government's motion. (*See generally* Def's Opp.) Instead, Daskal has affirmatively stated that he "will not reference the potential 10-year mandatory minimum sentence that he faces" at trial. (Def's Opp. at 1. n.1.) Thus, the Government's motion is DENIED AS MOOT.[12]

### E.     Statements about Daskal's Interactions with Other Young Women

The Government seeks an order admitting "various statements to the Victim about close relationships that he had with other young females, and that at times he referred to those females, in substance, as 'my girls' and 'my other [Victim Name]'s." (Gov't Mot. at 17.) The Defendant opposes this motion on the basis that the statements lack "any concrete basis," are "amorphous, and devoid of any real factual content," and are "exceptionally prejudicial." (Def's. Opp. at 5.)

---

[12] If the Defense does attempt to introduce such evidence at trial, the court will not permit it to do so. Evidence of this type is not generally admissible at trial under the Supreme Court's holding in *Shannon v. United States*, 512 U.S. 573, 579 (1994). "The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict." *Id.* Therefore, "[i]nformation regarding the consequences of a verdict is [] irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id; see also United States v. Watts*, 934 F. Supp. 2d 451, 464 (E.D.N.Y. 2013). Such evidence is neither relevant under Rule 401 nor sufficiently probative to outweigh its potential to confuse the jury under Rule 403.

Evidence regarding past conduct need not be assessed as "other crimes, wrongs, or acts" under Rule 404(b) if that conduct "arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). For example, in *United States v. Robinson* the Second Circuit affirmed a district court's holding that "recorded telephone calls in which [the defendant] discussed his former, current, or prospective control of other prostitutes," were admissible "as proof of the nature of the relationship between [the defendant] and Jane Doe." 702 F.3d 22, 36-37 (2d Cir. 2012). The court reasoned that because "a critical factual dispute in the case was whether the relationship between [the defendant] and Jane Doe could be characterized as the relationship between a pimp and a prostitute," the phone calls were inextricably linked with the charged offense and thus did "not constitute other act evidence within the meaning of Rule 404(b)." *Id.* Evidence only falls within the gambit of Rule 404(b) where there are specific "bad acts" alleged. *See also United States v. Joubert*, 980 F. Supp. 2d 47, 51 (D.N.H. 2013); *cf. United States v. Vickers*, 708 F. App'x 732, 736-37 (2d Cir. 2017) (Summary Order) (finding that testimony about specifically alleged, albeit uncharged, other bad acts, including the techniques a defendant "employed to gain [other] victims' trust [such as] having the boys sit on his lap, massaging their feet, sleeping in bed with them, giving them drugs and alcohol, and promising them money in exchange for sex acts" was admissible under Rule 404(b) as "probative of [the defendant's] knowledge of how to secure adolescent boys' trust so he could sexually abuse them").

The Government's briefing does not specifically allege any prior bad acts. (*See* Gov't Mot. at 17.) The court thus hesitates to admit the statements at issue under Rule 404(b). Much like in *Robinson*, 702 F.3d 22 at 37, however, the statements go to the "critical

factual dispute" over whether Daskal did, in fact, have sexual encounters with the Complaining Witness when she was a minor. The Government argues that Daskal's statements regarding "my girls" are direct evidence of his efforts to "groom" the Complaining Witness for sex. (Gov't Mot. at 17.) In effect, the statements are part of the Government's theory of the case. Such a theory is not without precedent in sex abuse cases. Courts have recognized "grooming" as a way in which adults seeking to have sexual relationships with minors prime their victims to enter into a sexual relationship.[13] Employing specific techniques to gain a young person's trust and gradually make a young person feel comfortable with the nature of an adult-minor relationship, *see e.g.*, *Vickers*, 708 F. App'x at 736-37, is a well-recognized way that adult abusers groom children for sex.

---

[13] Courts discussing the sexual abuse of minors have acknowledged the disagreements among experts about the precise contours of what behaviors should be included in a definition of "grooming." *See United States v. Maxwell*, No. 20-CR-330 (AJN), 2021 WL 5283951, at *2 (S.D.N.Y. Nov. 11, 2021). There appears, however, to be consensus within the Second Circuit that the "core concept of grooming is well-accepted in the relevant literature, even if experts continue to debate the details," *id.* at *3, and that certain activities "constitute[] classic 'grooming' behavior in preparation for a future sexual encounter." *United States v. Brand*, 467 F.3d 179, 203 (2d Cir. 2006), *abrogated on other grounds by United States v. Cabrera*, 13 F.4th 140 (2d Cir. 2021). Courts have, for example, recognized the "broad[] principle [that] grooming functions through the development of trust." *Maxwell*, 2021 WL 5283951, at *5. *See also Feitosa v. Keem*, No. 22-CV-377S, 2023 WL 2267055, at *1 n.2 (W.D.N.Y. Feb. 28, 2023) ("In common parlance, 'grooming' is understood to be a tactic where someone *methodically builds a trusting relationship with a child or young adult*, their family, and community to manipulate, coerce, or force the child or young adult to engage in sexual activities.") (emphasis added); *Am. Booksellers Found. For Free Expression v. Dean*, 202 F. Supp. 2d 300, 316 (D. Vt. 2002) (defining "the practice known as grooming" as "the process child sexual predators use to gain the trust and lower the sexual inhibitions of potential child victims").

Therefore, evidence that Daskal "groomed" the Complaining Witness for sex would be admissible as supporting evidence pertaining to a critical factual dispute. The Government will be permitted to introduce at trial Daskal's statements to the Complaining Witness regarding his close relationships with other young women, but only to the extent that they are being introduced to show how he went about building a relationship of trust with the Complaining Witness and making her feel comfortable with the nature of their relationship. The court acknowledges that such statements have the potential to be overwhelmingly prejudicial under Rule 403, but finds that their probative value will, in certain circumstances as described above, outweigh any prejudicial effect. Fed. R. Evid. 403. The Government's motion is thus GRANTED, subject to the limitations described herein. Nonetheless, the court cautions the Government to avoid any unfounded insinuation that other criminal allegations of misconduct have been made. To do so would be to impermissibly prejudice Daskal. If at any time the Government oversteps this bound, the Defense remains free to object.

### F.    Reciprocal Disclosure Under Federal Rule of Criminal Procedure 16(b)(1)(A)

Under Federal Rule of Criminal Procedure 16(b)(1)(A) ("Rule 16"), a defendant is required to disclose to the government, upon request, "books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items" that it intends to use in its case-in-chief at trial if the government has complied with its disclosure requirements under Rule 16(a)(1)(E). *See* Fed. R. Crim. P. 16(b)(1)(A). When a defendant "avail[s] himself of the strategy to obtain discovery of the government, he must comply with the requirement for reciprocal discovery." *United States v. Ortega*, No. 22-CR-91-4 (RA), 2023 WL 145615, at *1 (S.D.N.Y. Jan. 10, 2023). "Rule 16 does not allow the defendant to have it both ways—that is, he cannot

obtain the government's evidence without disclosing his own evidence." *Id.*

The Government contends that it has "repeatedly requested reciprocal discovery" from Daskal and has not received any documents that will be used at trial. (Gov't Mot. at 23.) Daskal argues that the Government is not entitled to exhibits that he intends to use for cross-examination purposes. (Def's. Opp. at 9-10.)

Daskal is correct that as a general matter impeachment materials are not subject to Rule 16(b)(1)(A) disclosure. *See United States v. Napout*, No. 15-CR-252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017). By its own terms, Rule 16(b)(1)(A) is applicable only to materials that the defendant intends to use in its "case-in-chief at trial." Fed. R. Crim. P. 16(b)(1)(A). But the term "case-in-chief" in the Rule 16 context has been interpreted to refer to "the purpose of the evidence's introduction and not the timing of the evidence's introduction[.]" *United States v. Aiyaswamy*, No. 15-CR-568-1 (LHK), 2017 WL 1365228, at *4 (N.D. Cal. Apr. 14, 2017). "Where a defendant cross-examines a government witness *to buttress her theory of the case*, rather than to impeach the testimony given by the witness on direct examination, the cross-examination is properly seen as part of the defendant's case-in-chief." *Napout*, 2017 WL 6375729, at *7 (emphasis added); *see also Aiyaswamy*, 2017 WL 13665228, at *4 (finding that evidence introduced for "substantively challenging the elements of the charged offense" is part of the defendant's case-in-chief). Rule 16(b)(1)(A) disclosure thus extends to all non-impeachment exhibits that defense plans to use at trial, "whether the exhibits will be introduced through a government witness or a witness called by a [d]efendant." *Napout*, 2017 WL 6375729, at *7; *see also United States v. Smothers*, No. 20-CR-213 (KAM), __ F. Supp. 3d __, 2023 WL 348870, at *22 (E.D.N.Y.

Jan. 20, 2023). "Nearly every court to consider the issue has concluded the same." *United States v. Crowder*, 325 F. Supp. 3d 131, 136 (D.D.C. 2018) (citing cases).

Daskal argues that there is no distinction between his "impeachment" materials and cross-examination evidence more broadly because the charges center on the Complaining Witness's credibility. (Def's. Opp. at 10.) The court agrees that Daskal's guilt of the charged offenses is inextricably intertwined with the Complaining Witness's credibility. This is due to the nature of the charges themselves. But this makes it all the more likely that Daskal will present his theory of the case through cross-examination exhibits. In effect, the cross-examination materials will be used to assert Daskal's narrative of the events rather than solely to impeach the Complaining Witness. They will effectively be part of his case-in-chief. Materials of this nature—*i.e.*, those used to substantively challenge the elements of the charged offense rather than only discredit the Complaining Witness—must be disclosed under Rule 16(b)(1)(A). Otherwise, Daskal would be able to evade Rule 16(b)(1)(A)'s disclosure requirement.

Accordingly, the Government's motion is GRANTED. Daskal must disclose and produce substantive, non-impeachment exhibits, whether he intends to introduce them during cross-examination or after the Government rests. This includes all materials Daskal intends to use to buttress his theory of the case, *Napout*, 2017 WL 6375729, at *7, or to "substantively challeng[e] the elements of the charged offense[.]" *Aiyaswamy*, 2017 WL 13665228, at *4. The Government has now disclosed its witness list and Daskal has had time to prepare cross-examination. Daskal must therefore make his Rule 16(b)(1)(A) disclosures within two days of entry of this order.

## IV. DASKAL'S MOTIONS *IN LIMINE*

### A. Referring to the Complaining Witness as a "Minor," "Minor Victim," or "Victim"

Daskal moves *in limine* to preclude the Government "from referring to Jane Doe as a 'minor' or 'minor victim' in its presentation of evidence or argument at trial." (Def's. Mot. at 1.) The Government opposes this motion. (Gov't Opp. at 5-6.)

Daskal argues that the use of these terms would violate his right to due process under the Fifth Amendment, in that he must be presumed innocent until and unless the Government proves each element of the offenses charged. (Def's. Mot. at 6.) Referring to the Complaining Witness as a "victim,"[14] before the Government has proven that a crime was even committed would, by Daskal's logic, invert that presumption and the corresponding burden— "inherently convey[ing] to the jury a conclusion that Jane Doe has suffered due to Mr. Daskal's actions." (Def's. Mot. at 6.) In doing so, the Defendant insists, the Government would be "impermissibl[y] vouching" for the Complaining Witness's testimony in a manner "tantamount to telling the jury that she testified truthfully." (*Id.*) Invoking its right to "use desired rhetorical devices and terminology as part of its argument," (Gov't Opp. at 5), the Government counters that using these terms in no way invades on the province of the jury to determine witness credibility. The "Government's theory of the case," it argues, is not "an expression of counsel's opinion." (*Id.*)

Improper vouching occurs where the "jury [has been] asked to substitute the prosecutor's knowledge for the actual testimony."

---

[14] Daskal makes the same argument with regard to the term "minor." Unless the Defense intends to contest the Complaining Witness's date of birth, she was a minor during the period in question. To preclude use of a descriptive term to that effect would be nonsensical. The request to do so is DENIED.

*United States v. Salameh*, 152 F.3d 88, 135 (2d Cir. 1998). Thus, "[a] prosecutor must scrupulously refrain from injecting his credibility into any part of the trial." *United States v. Damsky*, 740 F.2d 134, 138 n.3 (2d Cir. 1984.) To this end, a prosecutor cannot, for example, make to the jury an improper "guarantee" upon which they may ultimately rely in place of the jurors' "own recollection of the testimony." *Id.* at 138. Prosecutors are, however, permitted to present the evidence in the record to a jury in a manner that accords with the Government's theory of the case. The line between these two can at times be challenging to demarcate. Attorney statements should not "imply the existence of extraneous proof," but the Second Circuit has noted that "what might superficially appear to be improper vouching for witness credibility may turn out on closer examination to be permissible reference to the evidence in the case." *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998).

This court is far from the first district court in this Circuit to address the issues of whether and how the Government may use the word "victim" in the course of a criminal trial. Most courts to reach this issue have declined to preclude the Government's use of the word wholesale. Some, including this court in a past case with distinguishable facts, have been primarily concerned with the risk (or lack thereof) of the jury being exposed to unnecessarily inflammatory statements. *See United States v. Full Play Group, S.A.*, No. 15-CR-252 (PKC), (E.D.N.Y.), Order of Jan. 4, 2023 ("[T]he words that [the defendant] seeks to excise are . . . neither extraneous or inflammatory."); *United States v. Gasperini*, No. 16-CR-441 (NGG), 2017 WL 3140366, at *7 (E.D.N.Y. July 21, 2017) ("[T]he court does not view the use of the challenged terms as unduly prejudicial in light of the issues being tried.") Others have stated, in sum and substance, that this is unlikely to arise as a real issue during the Government's case-in-chief, and that it is permissible as part of a jury address. *See United States v. Benjamin*, No. 18-CR-874 (JSR) (S.D.N.Y.), Tr. of May 8, 2019,

(Dkt. 53), at 6 ("I take it this would only come up . . . during either opening statements or summation. No one is going to say we now call victim 1. You are going to have, as I understand it, a pseudonym. I don't see any problem with that term being used, that's the government's view, as a victim.").

At least one judge has relied on curative jury instructions to ameliorate any possible prejudice to the Defendant. *United States v. Dupigny*, No. 18-CR-528 (JMF) (S.D.N.Y.), Tr. of Oct. 17, 2019, (Dkt. 198), at 49-50 ("It strikes me that precluding [the use of the words 'pimp' and 'victim'] altogether is both unnecessary and impractical. . . . [I]t's just hard to engage in a discussion of the charges here without using those terms, but again, I think any prejudice can be addressed through appropriate cautionary instructions."). In *Maxwell*, Judge Nathan denied a similar motion on the basis that "[i]t is appropriate for the government to use [the terms "victim" and "minor victim"] as representative of its litigating position," but specifically noted her intention to "revisit" the issue, "[i]f the government does this in any way that is atypical or unduly prejudicial." No. 20-CR-330 (AJN) (S.D.N.Y.), Tr. of Nov. 1, 2021, (Dkt. 465), at 4-5. One court, however, deviated slightly from the others. Persuaded by a host of out-of-circuit case law, the *Ray* court denied a motion to preclude reference to the complaining witnesses as "victims" in the Government's jury addresses but granted the motion to preclude such reference outside of the Government's jury addresses. 2022 WL 558146, at *25-26.

This court lands somewhere in between the conclusions reached in *Ray* and *Maxwell*. In many criminal cases, a witness's "victimhood" is not in dispute. A gunshot victim is a gunshot victim regardless of whether the criminal defendant being tried is ultimately convicted of pulling the trigger. But here, the question of whether the Complaining Witness suffered the alleged harm goes

to the crux of the charges against Daskal. Such factual determinations are to be made by the jury alone. To refer offhand to the Complaining Witness as "the victim" throughout the presentation of the evidence could suggest otherwise, implying the factual issue is settled or the Government *knows* she is a victim for reasons unknown to the jury. *See United States v. Arias-Javier*, 392 F. App'x 896, 898 (2d Cir. 2010) (Summary Order) ("The prosecution is permitted vigorously to argue for the jury to find its witnesses credible" but not to "link its own credibility to that of the witness, or imply the existence of extraneous proof supporting the witness's credibility."). That said, "the Government is permitted to lay out for the jury in its opening statement what it expects the evidence to prove, including that the [complaining witness is] a victim[]," *Ray*, 2022 WL 558146, at * 26, and is wholly within its rights to argue forcefully its theory of the case during its summation. Lastly, it would, as Judge Furman has stated, be "both unnecessary and impractical" to preclude all persons from using such words throughout the trial, as it may be "hard to engage in discussion of the charges [] without using those terms." *United States. v. Dupigny*, No. 18-CR-528 (JMF) (S.D.N.Y.), Tr. of Oct. 17, 2019, (Dkt. 198), at 49–50.

As such, Daskal's motion to preclude is GRANTED IN PART AND DENIED IN PART. The Government is permitted to refer to the Complaining Witness as a "victim" or a "minor victim" during its opening and closing jury addresses, so long as it does so in a manner that makes clear its reliance on the evidence presented to the jury at trial.[15] The Government is also permitted to elicit witness testimony relating to the Complaining Witness's alleged victimhood. To preclude reference to the "victim" entirely would

---

[15] Daskal argues that referring to the Complaining Witness as a "victim" at closing would also imply the complaining witness's credibility. This court disagrees. The Government is obliged to set forth what it believes the evidence has shown in its closing argument. *See United States v. Benjamin*, No. 18-CR-874 (JSR) (S.D.N.Y.), Tr. of May 8, 2019, (Dkt. 53), at 6.

be "unnecessary and impractical" and would detract from the Government's ability to prosecute its case and attempt to prove the Defendant's guilt in good faith. But the Government may not refer to the Complaining Witness as the "victim" during its presentation of the evidence. It may not call "the victim" to the stand to testify. Nor may it ask a corroborating witness how they know "the victim," and so forth.[16] If, at trial, Daskal feels the Government has crossed the line into impermissible use of the term "victim," he should feel free to object.

## V.   *DAUBERT* MOTION

Daskal seeks to exclude the testimony of the Government's two expert witnesses, Special Agent ("SA") Richard Busick and Digital Forensic Examiner Louis J. DiOrio, both from the Federal Bureau of Investigation ("FBI"). (Daub. Mot. at 1.) He contends that SA Busick's methodology is so unreliable that his testimony should be excluded or substantially limited, (*id.* at 14), and that the Government's Rule 16 disclosure for Examiner DiOrio is so deficient that his testimony must be excluded in full. (*Id.* at 1-2.)

### A.      Rule 702 and *Daubert*

#### 1.   Legal Framework

A trial court is obligated to act as a gatekeeper for expert testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). This applies with equal force for all expert witnesses, and not only those who put forth scientific testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The admission of expert testimony is governed by Rule 702, which states as follows:

---

[16] Witnesses may refer to the Complaining Witness by her first name, or by her first name and pseudonymous last name. *See supra* Note 6.

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
>> (b) the testimony is based on sufficient facts or data;
>
>> (c) the testimony is the product of reliable principles and methods; and
>
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under this Rule, a district court must find that the witness is "qualified as an expert," that their opinion is "based upon reliable data and methodology," and that the expert testimony "will assist the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). "In addition to the requirements of Rule 702, expert testimony is subject to Rule 403, and may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Nimely*, 414 F.3d at 397 (quoting Rule 403).

To assess whether a witness is qualified as an expert, courts look to their "knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). The court must find that the witness is, in fact, an expert in the area in which they intend to testify. *United States v. Mostafa*, No. 04-CR-356 (KBF), 2014 WL 1744717, at *1 (S.D.N.Y. Apr. 23, 2014).

The reliability of an expert's testimony depends on "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology

properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592-93. The following factors are used to determine whether an expert opinion is sufficiently reliable: whether a theory or technique can be and has been tested, whether it has been subjected to peer review, its error rate, and whether scientific standards exist to govern the theory or technique's application or operation. *Id.* at 593-94. Rule 703 allows experts to rely on facts or data that experts in the particular field would reasonably rely on, regardless of whether that underlying data would itself be admissible or not. Fed. R. Evid. 703. And, an expert opinion can be excluded if there is too great an analytical gap between the data and the opinion proffered. *Nimely,* 414 F.3d at 396.

"Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert,* 509 U.S. at 591. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591-92. To determine whether expert testimony is relevant, the court must look to Rule 401. *Wurtzel v. Starbucks Coffee Co.,* 257 F. Supp. 2d 520, 525 (E.D.N.Y. 2003).

### 2. Analysis

Daskal takes aim at the reliability of SA Busick's methodology—historical cell site data analysis—arguing that "it necessarily rests on fundamentally unsound assumptions" to such a degree that SA Busick's "opinions by definition cannot pass muster under *Daubert.*" (Daub. Mot. at 11.) The reliability of expert testimony on historical cell site data analysis has been widely discussed in the federal judiciary. *See, e.g., United States v. Hill,* 818 F.3d 289, 298-99 (7th Cir. 2016); *United States v Reynolds,* 626 F. App'x 610, 613-17 (6th Cir. 2015) (Summary Order). Multiple district courts within this Circuit have recently found historical cell site analysis to be sufficiently reliable to pass muster under *Daubert. See United States v. Belloisi,* No. 20-CR-219 (DLI), 2023 WL

2716551, at *2 (E.D.N.Y. Mar. 30, 2023); *United States v. Ramsey*, No. 21-CR-495 (ARR), 2023 WL 2523193, at *18 (E.D.N.Y. Mar. 15, 2023); *United States v. Ray*, No. 20-CR-110 (LJL), 2022 WL 101911, at *6-7 (S.D.N.Y. Jan. 11, 2022).

As the Government notes, SA Busick's testimony was the subject of a similar *Daubert* motion in *United States v. Zottola*, 18-CR-609-10 (HG) (E.D.N.Y. 2022). (*See* Daub. Opp. at 3; Ex. A to Daub. Opp. (Dkt. 121-1).) There, Judge Gonzalez ultimately found SA Busick's methodology to be sufficiently reliable under Rule 702 due to the widespread acceptance of historical cell site data analysis by courts in this circuit. (Ex. B to Daub. Opp. (Dkt. 110-2) at 76.) He also held that concerns over reliability of historical cell cite data analysis could be addressed on cross-examination, rather than through wholesale exclusion of expert testimony. (*Id.*)

The court sees no reason to depart from these cases. "Historical cell-site analysis can show with sufficient reliability that a phone was in a general area, especially in a well-populated one. It shows the cell sites with which the person's cell phone connected, and the science is well understood." *Hill*, 818 F.3d at 298. The court does, however, acknowledge the validity of Daskal's concerns regarding the accuracy of historical cell site data analysis. The Seventh Circuit's dicta in *Hill* helps guide this court in assessing the possible inaccuracy and risks of this methodology:

> Our concern is that the jury may overestimate the quality of the information provided by this analysis. We therefore caution the government not to present historical cell-site evidence without clearly indicating the level of precision—or imprecision—with which that particular evidence pinpoints a person's location at a given time. The admission of historical cell-site evidence that over-promises on the technique's precision—or fails to account

adequately for its potential flaws—may well be an abuse of discretion.

*Id.* at 299. SA Busick's testimony should not overstate the accuracy of historical cell site data analysis. The Government's opposition suggests that SA Busick intends to testify at an appropriate level of generality. (Daub. Opp. at 4 ("Agent Busick is expected to testify only that the Victim's phone was in the general vicinity of the cell sites to which it connected and how and why that is. [SA Busick] does not intend to testify that the Victim or her cellphone was at a specific street address or location.").) Daskal remains free to cross-examine SA Busick on the accuracy of his chosen methodology. *See Belloisi*, 2023 WL 2716551, at *2 (noting that issues that may exist in expert testimony regarding historical cell site data go to weight of the testimony). A *Daubert* hearing is not, however, needed to explore the reliability of historical cell site data analysis. *See Belloisi*, 2023 WL 2716551, at *2 (declining to hold a *Daubert* hearing over similar expert testimony because "the admissibility of cell site testimony is relatively non-controversial at this point"); *Ray*, 2022 WL 101911, at *8 (admitting expert testimony on historical cell site data without conducting a hearing).

Nor do SA Busick's maps warrant exclusion under Rule 403 for being misleading. Daskal argues that the maps accompanying SA Busick's testimony purport to depict the distance of a cell phone to a specific cell site using shaded in circles and wedges. (Daub. Mot. at 12-13.) But SA Busick's maps do no such thing. They include shaded arcs "solely [to] indicate[] the general direction of the radio frequency signal." (Ex. A to Daub. Mot. at ECF 9.) SA Busick's maps also all refer to "cell site and sectors used" by a cell phone rather than to a cell phone's location. (*See, e.g., id.* at ECF 13-15.) The maps thus do not purport to represent the location of the cell phone and instead clearly depict the usage of specific

cell sites and sectors. SA Busick's maps thus do not warrant exclusion under Rule 403. These maps will not be excluded at trial so long as SA Busick does not use them to provide a misleading impression of the accuracy of historical cell site data analysis in identifying the specific location of a cell phone.

Moreover, the Second Circuit has determined that historical cell site data—which few jurors will have encountered prior to trial—is properly admitted through expert testimony rather than lay witness testimony. *See United States v. Natal*, 849 F.3d 530, 536 (2d Cir. 2017) ("We hereby join the Seventh and Tenth Circuits in holding that testimony on how cell phone towers operate must be offered by an expert witness."). As Judge Irizarry noted in *Belloisi*, this type of testimony is "precisely the kind that is beyond the ken of a lay jury and requires the testimony of an expert to help the jury understand the evidence." 2023 WL 2716551, at *2; *see also United States v. Elias*, No. 18-CR-33-2 (NGG), 2022 WL 715486 at *9 (E.D.N.Y. Mar. 10, 2022) ("[I]f the government intends to offer cell site location data, it must qualify an expert to testify about the data and comply with all of the relevant rules of evidence and procedure.").

SA Busick is also properly qualified to provide expert testimony on historical cell site data analysis. He is a member of the FBI's Cellular Analysis Support Team ("CAST") and has taught multiple courses on historical cell site data analysis. (Ex. A to Daub. Mot. at ECF 35-36.) He has been qualified as an expert in the field of cell site data analysis nine times in the Eastern District of New York, including as recently as May 2023. (*Id.* at ECF 3-5.) SA Busick is indeed qualified to proffer expert testimony of this nature.

The court also has little concern about the accuracy of the information underlying SA Busick's testimony. His analysis is based on records and data previously produced for a specific phone

number during periods of time between July 31, 2017 and August 31, 2017, as well as November 5-6, 2017. (Ex. A to Daub. Mot. at ECF 2.) Data provided by cellular service providers and "maintained by those providers in the ordinary course of their business" is sufficiently accurate to underly expert testimony. *Ray*, 2022 WL 101911, at *7. The Government also notes that SA Busick's testimony will refer to "License Plate Reader data obtained from the [NYPD]." (Daub. Opp. at 3.) The court similarly has no reason to doubt the accuracy of this data.[17]

Finally, this expert testimony is not unduly prejudicial under Rule 403. *See Nimely*, 414 F.3d at 397. Location analysis bears on an essential element of a charge against Daskal—transporting an individual who had not yet attained the age of 18 years in interstate commerce. (*See* Supp. Indictment at 2); *see also* 18 U.S.C. § 2423(a). To the extent that SA Busick's testimony discusses "active cell site sectors that the Victim's phone connected with on particular dates and times," (Daub. Opp. at 3), it is probative as to this topic.[18] This contrasts with *United States v. Nieves,* where the court excluded cell site testimony on Rule 403 grounds due to its "very modest relevance . . . [that] invite[d] ungrounded speculation and confusion" and because the testimony was not qualified by any statements regarding the limitations of this cell site data analysis. No. 19-CR-354 (JSR), 2021 WL 1535338, at *1 (S.D.N.Y. Apr. 19, 2021). There is, of course, some amount of risk that the jury misunderstands the accuracy or precision of historical cell site data analysis, which could in turn be a source of prejudice. *See* Fed. R. Evid. 403. But this can be mitigated by cross-examination on the accuracy of this methodology. SA

---

[17] Where SA Busick is testifying in a non-expert capacity about "additional call and toll records," he must make clear that his statements are not made as an expert, but as a lay witness. (*See* Ex. A to Daub. Mot. at ECF 2.)

[18] In this manner, it is also helpful to the jury. *See Daubert*, 509 U.S. at 591 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

Busick's testimony is thus not unduly prejudicial as to warrant exclusion under Rule 403.

In sum Daskal's motion to exclude SA Busick's testimony is DE-NIED.

### B.  Federal Rule of Criminal Procedure 16(a)(1)(G)(iii)

#### 1.  Legal Framework

Under Federal Rule of Criminal Procedure 16, the government must disclose:

> [A] complete statement of all opinions that the govern-ment will elicit from the witness in its case-in-chief, or during its rebuttal to counter testimony that the defend-ant has timely disclosed under (b)(1)(C); the bases and reasons for them; the witness's qualifications, including a list of all publications authored in the previous 10 years; and a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition.

Fed. R. Crim. P. 16(a)(1)(G)(iii). This applies to "any testimony that the government intends to use at trial under Federal Rules of Evidence 702, 703, or 705 during its case-in-chief." *Id.* at 16(a)(1)(G)(i). The defendant is required to make reciprocal dis-closures if the government complies with a disclosure request under Rule 16(a)(1)(G), or if the defendant gives notice of an intent to present expert testimony on the defendant's mental con-dition. *Id.* at 16(b)(1)(G)(i).

If a party fails to comply with this rule, the court may "(A) order that party to permit the discovery or inspection; specify its time, place, and manner and prescribe other just terms and conditions; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; (D) enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d). "[T]he district

court has broad discretion to determine what remedial action, if any, is appropriate." *United States v. Miller*, 116 F.3d 641, 681 (2d Cir. 1997); *see also, e.g.*, *United States v. Douglas*, 336 F. App'x 11, 13 (2d Cir. 2009) (Summary Order) (noting that the district court properly addressed a possible Rule 16(a)(1)(G) violation by giving defense counsel additional time to review the expert materials and to prepare for cross-examination of the late-noticed expert); *United States v. Tin Yat Chin*, 476 F.3d 144, 146 (2d Cir. 2007) ("[T]he able district court [in response to a late expert disclosure] . . . gave defense counsel what he needed: time to prepare to cross-examine [the expert]. Specifically, the district court granted the defense a one-day continuance for this purpose.").

2.  Analysis

Daskal also argues that the Government's Rule 16 disclosure as to Examiner DiOrio is deficient because it fails to describe his opinions or the bases and reasons for those opinions. (Daub. Mot. at 15.) The Government's Rule 16 disclosure for Examiner DiOrio notes that he is "expected to testify regarding the forensic extraction of the electronic devices in this case," the "digital artifacts that were contained in the electronic devices[,]" and "about the recovery of parsed, carved, and/or deleted digital artifacts from these electronic devices." (Ex. B to Daub. Mot. at 2.)

The court agrees that Examiner DiOrio's Rule 16 disclosure lacks details on the precise opinions that he will provide. The Government's disclosure merely lists the topics that Examiner DiOrio will testify about without providing the specific opinions that he will render on these topics. (*Id.*) Such a disclosure fails to comply with Rule 16. *See United States v. Ulbricht*, No. 14-CR-68 (KBF), 2015 WL 413318, at *5 (S.D.N.Y. Feb. 1, 2015) (noting that exclusion under Rule 16 is "justified when the expert disclosures merely list general topics about which the expert will testify"); *United States v. Baker*, No. 14-CR-356 (ENV), 2016 WL 7176588,

at *1 (E.D.N.Y. Dec. 8, 2016) ("[M]erely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions."); *see also* Fed. R. Crim. P. 16 advisory committee's note to 2022 amendment ("The amendment requires a complete statement of all opinions the expert will provide, but does not require a verbatim recitation of the testimony the expert will give at trial."). The Rule 16 notice is thus insufficient.

The court has a number of options at its disposal to remedy the Government's Rule 16 violation. *See* Fed. R. Crim. P. 16(d). Daskal urges exclusion of Examiner DiOrio's testimony in full given the proximity to trial and his inability to prepare an effective cross-examination before Examiner DiOrio testifies. (Daub. Mot. at 17.) The Government points to its previous disclosure of electronic evidence in this case to argue that Daskal has long been on notice of the contents of Examiner DiOrio's testimony and will in no way be surprised by it. (Daub. Opp. at 6.)

The court opts not to qualify Examiner DiOrio as an expert, but to allow him to testify as a lay witness instead. Under Rule 701, lay witness testimony is proper if it is rationally based on the witness's perception, is helpful to understanding testimony or a fact at issue, and is not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. *See* Fed. R. Evid. 701. The Government notes that it designated Examiner DiOrio as an expert "in an abundance of caution," and that it does not expect that Examiner DiOrio's expected testimony will implicate or constitute expert testimony. (*Id.* at 5.) The court agrees that an expert qualification is not necessary. Examiner DiOrio's expected testimony on the forensic extractions performed on certain electronics, the tools used in these extractions, the state of extracted files, and the storage of the Government's electronic exhibits does not require an expert certification. It meets the three criteria for lay testimony under Rule 701: it is based on

Examiner DiOrio's perception of the review of data from the Complaining Witness and Daskal's electronics, it will assist in the jury in understanding these materials, and it does not require specialized knowledge. Indeed, multiple courts in this Circuit have found that testimony regarding the process of producing and contents of forensic extracts is not the proper subject of expert testimony. *See United States v. Marsh*, 568 F. App'x 15, 16-17 (2d Cir. 2014) (Summary Order); *United States v. Saipov*, No. 17-CR-722 (VSB), 2023 WL 4199415, at *11 (S.D.N.Y. June 27, 2023); *United States v. Ray*, No. 20-CR-110 (LJL), 2022 WL 817270, at *1 (S.D.N.Y. Mar. 16, 2022). An expert qualification is thus not needed for Examiner DiOrio.

Daskal's motion to preclude the expert testimony of Examiner DiOrio's is thus GRANTED, but he will be permitted to testify as a lay witness.

## VI.  CONCLUSION

For the reasons stated above, the Government's motions *in limine* are GRANTED IN PART, DENIED IN PART, and RESERVED IN PART, Daskal's motions *in limine* are GRANTED IN PART and DENIED IN PART, and Daskal's *Daubert* motion is GRANTED IN PART AND DENIED IN PART.

SO ORDERED.

Dated:    Brooklyn, New York
         July 12, 2023

s/Nicholas G. Garaufis

NICHOLAS G. GARAUFIS
United States District Judge