UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
UNITED STATES OF AMERICA,


    – against –                                         No. 21-cr-110 (NGG)


JACOB DASKAL,

                            Defendant.
------------------------------------------------------------------------x


---

## SENTENCING MEMORANDUM OF DEFENDANT JACOB DASKAL

---


**MEISTER SEELIG & FEIN PLLC**
*Attorneys for Jacob Daskal*
125 Park Avenue, 7th Floor
New York, New York 10017
Phone: (212) 655-3500
Fax: (212) 655-3535

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION .................................................................................................. 1

II.     JACOB ACCEPTS FULL RESPONSIBILITY FOR THE GRAVITY OF HIS
        CONDUCT AND IS PAINFULLY REMORSEFUL FOR THE HARM HE CAUSED .. 2

III.    A SENTENCE AT THE LOW-END OF MR. DASKAL'S PLEA WOULD AVOID
        UNWARRANTED DISPARITIES .................................................................... 6

IV.     JACOB'S PERSONAL HISTORY OF COMMUNITY WORK AND  FAMILIAL
        EXCEPTIONALISM MERIT CONSIDERATION IN CRAFTING HIS  SENTENCE. 10

        A.      For Decades, Jacob Has Volunteered his Time to Serve the Community,
                Including Weekly Work Coordinating Food Distribution for the Hungry ........... 12

        B.      Jacob has Devoted Himself to Caring for his Sickly Wife and Elderly Mother ... 17

        C.      Jacob Overcame a Painful Childhood ███████████ to Become a Patient,
                Warm and Dependable Family Man ................................................................. 19

V.      CONCLUSION................................................................................................. 24

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) .................................................................... 11

*United States v. Boyd*,
   No. 13-CR-890 (S.D.N.Y. 2015) ............................................................................ 9

*United States v. Corley*,
   No. 13-CR-48 (S.D.N.Y. 2013) ........................................................................ 8, 9

*United States v. Dykes*,
   No. 16-CR-670 (S.D.N.Y. 2018) ............................................................................ 9

*United States v. Fletcher*,
   No. 21-CR-227 (ERK) (E.D.N.Y. 2023) ............................................................... 9

*United States v. Flores*,
   No. 16-CR-324 (S.D.N.Y. 2019) ............................................................................ 9

*United States v. Flowers*,
   No. 12-CR-06067 (W.D.N.Y. 2012) ...................................................................... 8

*United States v. Friedman*,
   139 F. App'x 330 (2d Cir. 2005) ........................................................................... 8

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012) ........................................................... 10, 12

*United States v. Hightower*,
   No. 16-CR-505 (S.D.N.Y 2018) ............................................................................ 9

*United States v. Johnson*,
   221 F.3d 83 (2d Cir. 2000) ..................................................................................... 7

*United States v. Krause*,
   172 F.3d 39 (2d Cir. 1999) ..................................................................................... 7

*United States v. Larson*,
   112 F.3d 600 (2d Cir. 1997) ................................................................................... 7

*United States v. Leitzy*,
   No. 10-CR-736 (S.D.N.Y. 2011) ........................................................................... 8

ii

*United States v. Ministro-Tapia,*
  470 F.3d 137 (2d Cir. 2006) ............................................................................ 6

*United States v. Pinto-Thomaz,*
  No. 18-CR-579 (S.D.N.Y. July 29, 2019) .................................................... 1

*United States v. Ricketts,*
  99 F.3d 401 (2d Cir. 1995) ............................................................................ 10

*United States v. Salvador,*
  No. 98-CR-484, 2006 WL 2034637 (S.D.N.Y. July 19, 2006)................... 19

*United States v. Slater,*
  No. 48-CR-036, 2012 WL 6808470 (S.D.N.Y. Dec. 28, 2012) ................. 10

*United States v. Sloane,*
  308 F.R.D. 85 (E.D.N.Y. 2015)...................................................................... 23

**Statutes**

18 U.S.C. § 3553 ....................................................................... .1, 3, 5, 6, 10, 19

**Rules**

Federal Rule of Criminal Procedure 11(c)(1)(C)............................................ 6

**EXHIBIT LIST**

| |
|---|
| **Exhibit A**<br>**Jacob Daskal Letter** |
| **Exhibit B**<br>**Family Letters** |
| Chaya Bornstein |
| Esther Brody |
| Barry Daskal |
| Bella Daskal |
| Benzion Daskal |
| Chaim Daskal |
| Solomon Daskal |
| Pearl Dembitzer |
| Rose Teitelbaum |
| Sara Weiss |
| **Exhibit C**<br>**Community Letters** |
| Rabbi Chaim Fleisher |
| Rabbi Pesach Greenberg |
| Rabbi Chaim Halberstam |
| Rabbi Ben Zion Halberstam |
| Kevin Lichtenstein |

| Nechama Mueller |
| Anthony Tompkins |
| Chana Wieder |

Defendant Jacob Daskal respectfully submits this sentencing memorandum in support of his request for a sentence at the low-end permitted by the plea agreement, which would be sufficient but not greater than necessary to achieve the goals of the federal sentencing statute.

## I.   INTRODUCTION

The federal sentencing statute provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary" to satisfy the statutory goals of sentencing. 18 U.S.C. § 3553(a). For Jacob Daskal, that is the low-end of the range permitted by the plea agreement: 168 months, or 14 years' imprisonment.  No more is necessary to impose "just punishment" on Jacob, who will be close to 80 when he completes his sentence, under the best of circumstances.

Jacob has forthrightly and fully admitted his crime, and accepts responsibility for the awful harms he has wrought on the victim:

> The first thing I need to say to my victim is how deeply sorry I am for what I did. I can never take back what I did.  And I know that I can never repair the damage I did to this girl.  I know that she will live the rest of her life with emotional scars because of what I did to her.  Not an hour goes by that I don't think about my actions with pain and horror.  I am sorry beyond words for losing control of myself and taking advantage of an innocent young girl.

Ex. A, Jacob Daskal Ltr. at 1.

While he maintained his Constitutional right to a trial by jury longer than many, and pled only shortly before trial commenced, remaining cloaked in his constitutional protections does not undermine his fulsome acceptance of responsibility.  *See United States v. Pinto-Thomaz*, 18-CR-579 (JSR), Sentencing Tr. 11:21-24, ECF Doc. 154 (S.D.N.Y. July 29, 2019) (awarding defendant a reduction for acceptance of responsibility following trial, after he "admitted all he essential elements of really all three crimes and has exercised his constitutional right to go to trial but been unsuccessful").

1

No matter the timing of his plea, Jacob is forever branded by the crime he committed.  He has "seen the horror in [even his own children's] eyes when they think about [his] crime," and knows that "part of them will always look at [their father] differently."  Ex. A, Jacob Daskal Ltr. at 2.  Still, Jacob knows that it is only "[b]ecause of what [he] did, [his] own children have to look at their father as someone who did something unthinkable."  *Id.*  Jacob solemnly embraces the indelible shame that he will have to endure to begin to make amends for his crime.

A sentence at the low-end of the plea agreement—very substantial punishment—is sufficient for Jacob to repay his debt to society.  A sentence of 14 years' imprisonment will return him home only when he is an elderly man, having been separated from his elderly mother, eight children, and many dozens of grandchildren who rely on Jacob daily for help, care and grandfatherly cheer.  Given the magnitude of an 168 month sentence, as discussed fully below, when faced with defendant who committed similar crimes, courts in this circuit frequently imposed similar (or less punitive) sentences.  *See infra* § III.  The Court should do the same, and impose a sentence at the low-end of the plea agreement, which is sufficient but not greater than necessary for Jacob Daskal.

## II.   JACOB ACCEPTS FULL RESPONSIBILITY FOR THE GRAVITY OF HIS CONDUCT AND IS PAINFULLY REMORSEFUL FOR THE HARM HE CAUSED

Jacob recognizes the seriousness of his crime, and the lasting detrimental effect on the victim.  He is plagued by guilt and has opened up to his family, friends and community leaders about the terrible crime he committed.  Jacob's candor about his shame and regret reflects his deep remorse.  He willingly faces the awful reality of the harm he brought on the victim—although he knows that his family will never look at him the same way again.  *See* Ex. A, Jacob Daskal Ltr. at 2 ("I have seen the horror in their eyes when they think about my crime.  I know that . . . part of them will always look at me differently.  Because of what I did, my own children have to look at

2

their father as someone who did something unthinkable."). While Jacob's remorse, of course, cannot make amends for his crime, pursuant to the § 3553(a) factors, it is nonetheless an important consideration for the Court in determining what punishment is "sufficient, but not greater than necessary" for Jacob. *See, e.g.,* 18 U.S.C. § 3553(a)(2) (sentence should be "sufficient, but not greater than necessary" to "afford adequate deterrence to criminal conduct;" "protect the public from further crimes of the defendant;" and "provide the defendant with needed. . . correctional treatment").

Jacob has been forthcoming in his letter to the Court about his remorse, and profound guilt for the harm he caused the victim:

> The first thing I need to say to my victim is how deeply sorry I am for what I did. I know that I can never take back what I did. And I know that I can never repair the damage I did to this girl. She will live the rest of her life with emotional scars because of me. Not a day goes by, and many times in the day, that I don't think about what I did with pain and horror. To say that I am haunted by it all is an understatement. I am sorry beyond words for losing control of myself and taking advantage of an innocent young girl.

> Your Honor, I am 64 years old. I'll be 65 in just a few weeks. And I face the reality that I could spend the rest of my days in federal prison. But that's not even close to the worst part. I harmed an innocent child, caused years of anxiety and fear in my own family, and brought shame and disgrace on my community.

>              . . .

> I am pained, and so very ashamed that I abused the community's trust, and took advantage of a young girl who came to me seeking help and refuge. She came to me because I was considered an upstanding member of the community. Years have passed since my crime. I have been in therapy, and spent countless hours and sleepless nights thinking about what I did. I am horrified that I exploited my community position to abuse an innocent young girl and, in the process, I harmed my own family beyond repair.

Ex. A, Jacob Daskal Ltr. at 1-2.

Jacob's family members have similarly observed his sorrow and remorse. Jacob's wife of over 40 years, Bella Daskal, tells the Court: "I know how he has spent years living with shame and

regret for his actions." Ex. [B], Bella Daskal Ltr. at 1. Jacob has also shared his self-condemnation, and abject sadness with his children—the prospect of losing the respect of his children remains immensely painful for Jacob. His daughter, Esther describes: "I have been with him as he has cried over the immense pain he has caused, and he has told me how he wishes he could make amends for his actions. I know he would never ask for leniency, since he just wants to own his actions." Ex. B, Esther Brody Ltr. at 3.

Jacob's son, Solomon, who "[d]uring the entire time of this case . . . escorted [his] father to all his meetings with the attorneys and accompanied him to the court hearings," has had a close-up view of how Jacob has processed the grim reality of his criminal conduct. Ex. B, Solomon Daskal Ltr. at 3. Solomon observes that his father:

> [I]s truly a broken man. Often, when he sits in my office in one of the buildings that he manages and where he has permission to go, he breaks down in tears. I can only wonder at the number of tears that he has shed over this case. So many times he has said to me "I've done so much harm, it's hard to live with the wrong I've done and the pain I've caused so many, the pain I've caused my family." My father has told me over and over how he wishes he could show people just how much he regrets his actions.

*Id.*

Jacob's wife Bella recounts the remorse she has seen Jacob exhibit when he thinks no one is watching:

> These years since Jacob's case began have been a nightmare. Sleepless nights and pillows stained with tears have been regular fare when we are alone. How many times I wake up and find Jacob sitting on the side of his bed sobbing and berating himself for the damage he caused. This has poisoned so much of the beauty and good that has been our home.

Ex. B, Bella Daskal Ltr. at 1.

In the years since his crime, Jacob has shared his pain, shame, and regret with the members of his community. Accepting responsibility is a means for Jacob to humbly work to atone for his crime, and serve as a cautionary tale to others so inclined. Jacob is part of a tight-knit Hassidic

4

community in Boro Park.  He is specifically a member of the Bobov Hassidic sect in which

community members look to a single leader, the Grand Rabbi of Bobov, for guidance.  The Grand

Rabbi's approval is sought by every member of the community.  Still, Jacob has opened up to the

Rabbi, facing opprobrium from the religious leader he looks up to most.  Indeed, the Grand Rabbi

of Bobov himself, Rabbi Ben Zion Halberstam, shared that he is baffled by Jacob's grievous crime:

"How he lost his moral compass to become involved in such a circumstance is beyond me."  Ex.

C, Rabbi Ben Zion Halberstam Ltr. at 3.  Still, in his interactions with the Rabbi, Jacob has fully

and totally demonstrated his acceptance of responsibility.  As the Rabbi writes, Jacob's:

> [R]egret and remorse [are] total. Jacob is a broken man, and the scar on his heart
> and soul are indelibly marked. He has shed, and continues to shed, many, many
> tears. As the community leader, he has spoken to me openly many times about the
> heartbreak he feels every day for the harm he caused. His pain for the girl, his wife
> and his family and all those who looked up to him for all the good that he has done
> will be carried by him always.

Ex. C, Rabbi Ben Zion Halberstam Ltr. at 3.

The Grand Rabbi's son, Chaim Halberstam, has similarly counseled Jacob and witnessed

his deep shame, and guilt:

> [T]his case has impacted Jacob greatly.  Jacob is . . . tortured by guilt for the harm
> he has caused. I have seen him crying openly about what he has caused. So many
> innocent parties have been hurt and are in pain, including the girl and her family,
> Jacob's wife and their children and their wider family, as well as the community.
> Jacob is painfully aware of the tragedy involved. This case will haunt him for the
> rest of his life.

Ex. C, Rabbi Chaim Halberstam Ltr. at 2.  The Grand Rabbi's son, Chaim Halberstam, perhaps

summarized it best: whatever sentence the Court imposes, Jacob will never be the same "[b]ecause

of his acknowledgement of his awful transgression, his profound regret, shame, and the hurt that

he has caused."  Ex. C, Rabbi Chaim Halberstam Ltr. at 2.

The sentencing statute instructs the Court to impose "just punishment," defined as a

sentence that is "sufficient, but not greater than necessary" for the defendant.  18 U.S. Code §

3553(a).  No punishment can reverse the harm that Jacob's crime has already inflicted on his victim.  But, Jacob's fulsome acceptance of responsibility, palpable regret, and the acute shame that he has brought upon himself and his family, renders maximal punishment unnecessary to achieve the twins goals of the sentencing statute: deterrence and rehabilitation.  *See* 18 U.S.C. § 3553(a)(2).  A sentence at the low end of Jacob's plea would provide sufficient punishment. Nothing more is necessary, rendering the low-end an appropriate sentence under § 3553(a).  *See United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) ("Plainly, if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher. But we do not understand the district court to have committed any such error.").

## III.  A SENTENCE AT THE LOW-END OF MR. DASKAL'S PLEA WOULD AVOID UNWARRANTED DISPARITIES

Mr. Daskal's plea pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) permits a sentence of between 168 and 210 months' imprisonment.  Mr. Daskal is the first to acknowledge that his crime was extremely serious, and considerable punishment is thus contemplated in the plea.  But the Court's determination of an appropriate sentence should be anchored by the sentencing statute's admonition that the Court "shall consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Based on the particular facts of Mr. Daskal's case, including that it involved a single victim, the low-end of the plea range provides substantial, and sufficient punishment without running afoul of the sentencing statute's mandate to avoid unwarranted disparities.

A sentence of 168 months—14 years' imprisonment—would account for the severity of the crime and constitute very significant punishment for Jacob, who will be nearly 80 years old by

the time he is released.  It would likewise be in line with sentences imposed for similar crimes. Many courts in this Circuit have imposed sentences at or below the low end of Mr. Daskal's plea, on defendants who committed equivalent, or even more wide-ranging, crimes, involving more victims.

The following cases are representative examples within this Circuit, illustrating that a low-end sentence is likewise appropriate here:

- *United States v. Johnson*, 221 F.3d 83 (2d Cir. 2000). The defendant was sentenced to 88 months' imprisonment following a guilty plea to numerous crimes of a sexual nature involving least three minor victims, the youngest of whom was no more than 13 years old. The defendant in *Johnson* was also convicted of possessing hundreds of computer images containing child pornography. *Johnson* involved more victims, at least one of whom was younger than Jane Doe here. But the defendant was sentenced to 80 months less (or more than six and a half years less) than the low-end of Mr. Daskal's plea range.

- *United States v. Larson*, 112 F.3d 600 (2d Cir. 1997). The defendant was sentenced to 63 months' imprisonment. He was convicted at trial of transporting a minor who was 13-years-old with the intent to engage in sexual conduct. At trial, the victim testified that the defendant enticed him to the defendant's cabin under a pretense of going water skiing and swimming, and that the defendant "had plied him with liquor and engaged him in sexual acts." *Id.* at 602. The government also presented testimony from three additional victims that the defendant had similarly sexually abused them as minors. The *Larson* defendant enticed a total of four victims to join him in a remote location so he could sexually abuse them, when they were younger than Jane Doe was at the time of Mr. Daskal's crime. Still, the Court in *Larson* imposed a sentence that was 105 months (or close to nine years) below the low-end of Mr. Daskal's plea.

- *United States v. Krause*, 172 F.3d 39 (2d Cir. 1999). The defendant was sentenced to 120 months' imprisonment for traveling interstate with a minor with intent to engage in prohibited sexual conduct. The court found that the defendant had engaged in a pattern of abuse over a two-and-a-half year period, involving multiple minor victims. While the *Krause* defendant's sentence was 48 months less (or four years less) than the low-end of Mr. Daskal's plea, *Krause* involved both more victims and a longer duration of the criminal conduct than is present in this case.

- *United States v. Flowers*, No. 12-CR-06067 (W.D.N.Y. 2012). The defendant was sentenced to 84 months' imprisonment. He was convicted of transporting a 15-year old to engage in prohibited sex. *Flowers* involved a defendant who had two prior convictions for sex crimes involving minors; this record of recidivism increased the salience of deterrence. In contrast, this is Mr. Daskal's first case, and even with a sentence at the low-end of his plea, he will be nearly 80 years old when he is eventually released from prison, rendering

7

specific deterrence a less relevant concern.  Still, the *Flowers* court imposed a sentence that was 84 months (or seven years) below the low-end of Mr. Daskal's plea.

- *United States v. Friedman*, 139 F. App'x 330 (2d Cir. 2005).  The defendant was sentenced to 81 months' imprisonment.  He was convicted after trial of using the internet to entice a minor who was 14 years old at the time, to engage in sexual activity, and traveling interstate to engage in prohibited sexual activity involving a minor.  As in Mr. Daskal's case, one victim was involved in *Friedman*.  But the *Friedman* court imposed a sentence that was 87 months less (or more than seven years less) than the low-end of Mr. Daskal's plea agreement.

- *United States v. Leitzsey*, No. 10-CR-736 (S.D.N.Y. 2011).  The defendant was sentenced to 151 months' imprisonment.  He pled guilty to sex trafficking of a minor for coercing at least one minor victim into prostitution when she was 15 years old, and engaging in sexual conduct with that victim when she was a minor.  The victim described that the defendant "made me have sex with men for money at age 15. Even after I told him I didn't want to do it, he made me. He also made me have sex with him when I didn't want to. . . . I stayed around because I didn't want him to think I was telling on him and try to kill me. I was afraid of him."  *United States v. Leitzsey*, No. 10-CR-736, Gov. Sentencing Mem. at 3, ECF Doc. 23 (S.D.N.Y. Aug. 23, 2011).  Like Mr. Daskal's case, *Leitzsey* involved a single 15-year-old victim.  But unlike Mr. Daskal's case, the victim in *Leitzey* reported threats of violence by the defendant.  Still, the court imposed a sentence that was 17 months below the minimum in Mr. Daskal's plea.

- *United States v. Corley*, No. 13-CR-48 (S.D.N.Y. 2013).  The defendant was sentenced to 120 months' imprisonment.  He was convicted after a jury trial of three counts of sex trafficking of minors and one count of possessing child pornography.  The evidence at trial reflected that for a period of six months or more, "the defendant recruited and maintained" at least three minor victims who were 16 at the time, and a dozen or more other women each of the minor victims in his prostitution business "which he ran from his home and his work at ConEd . . . Despite knowing that they were mere girls, he nevertheless educated them about how his prostitution business worked, taught them the meaning of certain code words for sexual positions that prospective clients would request, photographed the Minor Victims in sexually suggestive clothing and poses, posted the pictures on the internet as part of advertisements he created that solicited customers for sex, and took half of each Minor Victim's earnings during the period they worked for him."  *United States v. Corley*, No. 13-CR-48, Gov. Sentencing Mem. at 4, ECF Doc. 60 (S.D.N.Y. Aug. 17, 2014).  The defendant in *Corley* was a college educated professional who the court found identified his victims by "hang[ing] around the Times Square area and identify people who were young people who appeared to . . . be at loose ends, they were runaways, from foster homes or home or institutions, had no means of support."  *United States v. Corley*, No. 13-CR-48, Sentencing Tr. at 23:10-13, ECF Doc. 66 (S.D.N.Y. May 22, 2014).  The defendant in *Corley* had three victims, in contrast to the single victim here.  Still, the court sentenced the *Corley* defendant to four years below the low-end of Mr. Daskal's plea.

- *United States v. Boyd*, No. 13-CR-890 (S.D.N.Y. 2015).  The defendant was sentenced to 120 months' imprisonment.  The defendant pled guilty to sex trafficking of minors for prostituting underage girls, over a period of at least three years.  The primary complaining victim reported that "the defendant placed and paid for advertisements offering Victim-1 – who was 15 and 16 years old at the time – for commercial sex on backpage.com, a classifieds webpage commonly used by sex traffickers acting as pimps. When men responded to the advertisements, the defendant directed Victim-1 to engage in commercial sex, sometimes driving Victim-1 to hotels to engage in the sex acts, and always taking all of the money paid to Victim-1."  *United States v. Boyd*, No. 13-CR-890, Gov. Sentencing Mem. at 1, ECF Doc. 53 (S.D.N.Y. Dec. 31, 2014).  While the defendant in *Boyd* groomed underage girls for prostitution for a period of three years—far longer than Mr. Daskal's criminal conduct involved here—the defendant was sentenced to four years below the minimum in Mr. Daskal's plea.

- *United States v. Flores*, No. 16-CR-324 (S.D.N.Y. 2019).  The defendant was sentenced to 135 months' imprisonment.  He was convicted of sex trafficking minors by force, fraud or coercion.  The case involved approximately a dozen victims, who reported to the court acts of physical violence which they endured at the hands of the defendant as part of the sex trafficking charged.  Although *Flores* involved both far more victims than this case, and express allegations of violence, the defendants in *Flores* was sentenced to nearly three years less than the low-end of Mr. Daskal's plea.

- *United States v. Hightower*, No. 16-CR-505 (S.D.N.Y. 2018).  The defendant was sentenced to 120 months' imprisonment.  He pled guilty to sex trafficking of minors by force or coercion.  At least three minor victims were involved, who the defendant threatened with violence.  There was also evidence of the defendant's longstanding involvement in similar conduct that was not charged.  While *Hightower* involved many more defendants than Mr. Daskal's case, and clear evidence of recidivism notably absent here, the *Hightower* court imposed a sentence four years below the low-end of Mr. Daskal's pela.

- *United States v. Dykes*, No. 16-CR-670 (S.D.N.Y. 2018).  The defendant was sentenced to 114 months' imprisonment.  He was convicted of a yearslong conspiracy to sex traffic minors, in which he prostituted at least five minor victims in a brothel he ran in his home. The minor victims were as young as 14.  The victims in *Dykes* were both younger and more numerous than in this case.  But the court imposed a sentence that was 54 months (or 4.5 years) below the minimum sentence permitted here.

- *United States v. Fletcher*, No. 21-CR-227 (ERK) (E.D.N.Y. 2023).  The defendant was sentenced to 91 months' imprisonment.  He pled guilty to engaging in sexual activity with teenage prostitutes over a period of months.  The government identified six minor victims. *Fletcher* involved far more victims than Mr. Daskal's case.  But the court sentenced the defendant to 77 months less (or more than six years less) than the minimum in Mr. Daskal's plea.

- *United States v. Ricketts*, 99 F.3d 401 (2d Cir. 1995).  The defendant was sentenced to 90 months' imprisonment.  He was convicted of transporting a minor in foreign commerce to engage in criminal sexual activity.  Like Mr. Daskal's case, *Ricketts* involved a single minor victim.  Still, the *Ricketts* sentence was 78 months less (or six and a half years less) than the low-end of Mr. Daskal's plea.

While no case is identical to Mr. Daskal's, these representative examples highlight that a sentence at the low end of Mr. Daskal's plea—168 months, or 14 years—would reflect the seriousness of Mr. Daskal's offense, and remain in line with sentences imposed in like cases.  A 14 year sentence is very substantial punishment.  Courts in this Circuit have plainly recognized as much, often imposing equivalent (or lesser but still very significant) sentences on defendants who committed similar crimes.  This Court should do the same.  No matter what sentence this Court imposes, Mr. Daskal will spend most (or all) of his remaining years in federal prison, separated from his family, his community, and everything he has ever known.  As the comparable cases in this Circuit reflect, a low-end sentence is thus sufficient here.

## IV.    JACOB'S PERSONAL HISTORY OF COMMUNITY WORK AND FAMILIAL EXCEPTIONALISM MERIT CONSIDERATION IN CRAFTING HIS SENTENCE

In determining what sentence is "sufficient, but not greater than necessary," the sentencing statute mandates that the Court weigh far more than simply Jacob's crime of conviction.  Wisely, under 18 U.S.C. § 3553(a), the first statutory factors that the Court is instructed to consider are "the nature and circumstances of the offense and the history and characteristics of the defendant." *United States v. Slater*, No. 04-CR-48-036 (JSR), 2012 WL 6808470, at *1 (S.D.N.Y. Dec. 28, 2012) (quoting 18 U.S.C. § 3553(a)(1)).  The realities of Jacob's life, his "personal history and characteristics," should feature prominently in the Court's consideration of a just sentence.  *See United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012) ("section 3553(a) . . . requires a court to take account of a defendant's character in imposing sentence.").

Jacob overcame a difficult childhood.  His parents both survived the unfathomable traumas of the Holocaust that decimated their families and loved ones.  Jacob's father was forever altered by the trauma. ███████████████████████████████████████████████
██████████████████████████████████████████████.  Still, Jacob, himself became a loving and supportive father.  He showed his eight children the warmth and patience that Jacob never received form his own father.   To this day, his interactions with his children and grandchildren exude equanimity and love.  Whether he is playing a game with a young grandchild, or helping an older grandchild with their studies, Jacob's relationship with his grandchildren sparks nothing but joy.

Jacob has brought the same kindness to his community work.  For decades, Jacob has spent hours each week collecting and distributing food to the less fortunate members of his community, working to ensure that no family goes hungry.  He is at the top of the community Rabbi's list of people to call for help when community members require charity and support.

Of course, the good that Jacob has done in his family and community cannot negate the terrible harm he wrought through his crime.  Indeed, Jacob readily acknowledges that his position as a central community volunteer facilitated his crime, telling the Court:

> I am pained, and so very ashamed that I abused the community's trust, and took advantage of a young girl who came to me seeking help and refuge.  She came to me because I was considered an upstanding member of the community.  Years have passed since my crime.  I have been in therapy, and spent countless hours and sleepless nights thinking about what I did.  I am horrified that I exploited my community position to abuse an innocent young girl and, in the process, I harmed my own family beyond repair.

Ex. A, Jacob Daskal Ltr. at 2.

Yet, Jacob's crime does not nullify the tangible good that he accomplished for hundreds or thousands of families in his community.  Jacob's decades-long commitment to service merits paramount consideration is crafting the appropriate sentence.  *See United States v. Adelson*, 441

11

F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) ("if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance."); *Gupta*, 904 F. Supp. 2d at 354 (section 3553(a) requires the court to consider the "measure of the man" in crafting an appropriate sentence).

### A.   For Decades, Jacob Has Volunteered his Time to Serve the Community, Including Weekly Work Coordinating Food Distribution for the Hungry

Jacob has devoted much of his life to serving the Jewish community that is so central to his life.  Jacob and his parents benefitted from the safety-net that the community provided, inspiring him to give back.  Jacob explains in his letter:

> What is most beautiful about the Hassidic community is how we look out for each other.  Growing up, my family benefited from the community safety net.  My parents were Holocaust survivors who had lost their families and everything they had in the war.  The Hassidic community helped them get jobs, housing, and schooling for me and my siblings.  As a young adult, I knew I had to give back to the community.

Ex. A, Jacob Daskal Ltr. at 1.  And that is precisely what Jacob did.  Jacob has spent the decades since he and his wife Bella established themselves as members of the Boro Park Hassidic community, devoting his spare time to ensuring that community members had their basic needs met.  *See* Ex. C, Rabbi Chaim Halberstam Ltr. at 1 ("As the son of the Grand Rabbi, I am frequently called upon by my father to become involved with and assist members of our community who are experiencing various hardships. . . . invariably I need to rely on or partner with individuals who can empathize with the pain of others and have the willingness and resources to help bring about viable long-term solutions. Jacob Daskal is one of these unique individuals.  Jacob's work over many years and the contribution he has made to society with his time and personal funds, have made a deep impression and is part of the community fabric that protects, shapes, and warms the lives of so many individuals.").

Jacob's son Chaim particularly portrays the "kindness and patience [his father] extended to others outside of the family and to perfect strangers who needed help." Ex. B, Chaim Daskal Ltr. at 1. Per Chaim:

> That help ranged from feeding families, many of them large families, who had no food; people who were down on their luck and could not afford even the barest of necessities; people who needed a listening ear or advice or referrals to various professionals. My father was like a one-man service center. As can be imagined, all this took up an inordinate amount of time and attention. A minimum of half his waking hours was spent on these outreach activities, and the rest on being a family person and work. Yet, we all learned to understand and appreciate that he was not taking time from us. Rather, it was part of the privilege of community service and outreach that would one day become our legacy.

*Id*.

The hallmark of Jacob's charity work was his the time, energy, and money he  consistently invested each week in providing food to community members who could not afford to buy food for themselves and their (often large) families.  *See* Ex. C, Rabbi Chaim Fleisher Ltr. at 1-2; Ex. C, Rabbi Pesach Greenberg Ltr. at 1-2. Jacob's daughter Esther recounts:

> Bread and bakeries fill my earliest memories and had an immense impact on my life. Those earliest memories are of my father going on Thursdays and Fridays to Weiss Bakery and then Shloimy's Bakery. It wasn't about buying bread for the Sabbath, but him helping out the owners at their busiest time and then carting a car full of left over breads and other baked goods for poor families and patients in the local hospitals. Hundreds or thousands of families have had enough to eat on the Sabbath because of the quiet, dependable work of my father.  He did this for thirty years and still supervises it until today. At one time when my father was on crutches, I helped him schlep boxes of bread. My father's distribution of bread to the poor week after week has not stopped. Nowadays, my brother Chaim and my husband, Samuel, go to collect them from the bakery and brings them back to my father to arrange the distribution. The baked goods were also shared with service organizations in Williamsburg, the Square Talmud Torah school and the Satmar Bikur Cholim Society for distribution at hospitals in the Five Boroughs.
>
> When it came to Passover, my father would bring piles and pallets of food to the house and people would come to collect it. We are talking about hundreds of families lining up to get food for their families for the 9-day festival. . . . That is what my father does for others. Over the years, he helped so many people, always busy with the needs of the community.

13

Ex. B, Esther Brody Ltr. at 2; *accord* Ex. B, Bella Daskal Ltr. at 3 (Jacob helped in the community by personally going out collecting and distributing food to the needy – including patients in hospitals that required kosher food, their families who didn't have what to eat, and soup kitchen organizations. . . . It can average 30-40 families a week, and many more before Jewish holidays. Many of these families are blessed with 6-plus children, but do not have sufficient funds or food for them . . . . The food is mostly picked up from bakeries and food establishments – most donated, and the rest purchased by Jacob. He would then take the food home and sort it for distribution.").

Jacob understood that many families in need of food were too embarrassed by their economic circumstances to wait in the food line on the street, or publicly ask for help. *See* Ex. B, Solomon Daskal Ltr. at 2 ("At the same time, there were many families who were too embarrassed to stand in lines to collect their food packages."). Those community members trusted Jacob to arrange deliveries so that "there should be no embarrassment for these families." *Id.* While helping them, Jacob "was very conscious of their feelings and arranged for them to collect their packages at specific times at our home, or we would drive them over to their homes." *Id.* Jacob's son Shlomo recalls that to be discrete in making deliveries to these families, "[b]efore [Shlomo] could drive, [he] would push a hand truck in the street with the deliveries to people's home." *Id.*

Jacob's food distribution work also consciously provided a source of support for small local businesses. Jacob's son Shlomo reports:

> Years ago, a neighbor named Lazer Gluck opened a deli called Luzee's Take Home in Boro Park, and he went to work with him on Fridays to help a struggling local businessman ensure he could get his business off the ground. While my father would serve customer (at no cost to the owner) if he would serve a customer that had a balance and wasn't able to pay, he would take out his own credit card and clear the customers balance. . . . But helping Lazer wasn't my father's only goal, he also ensured he and Lazer could help the wider community. At the end of the day on Friday, Lazer would put together two big packages of food for my father to distribute among the poor. Knowing Lazer's financial situation, my father never

14

took those packages at no cost. He made sure that even if there was a consideration discount that it was on the retail price.

*Id.* at 1-2.

Jacob's labor-intensive work feeding the less fortunate was integral to those families' very survival.  And over the years, Jacob's community volunteer work extended further yet.  The leader of Jacob's community, the Grand Rabbi of Bobov, reports that in his capacity as community leader, he "ha[s] to rely on many volunteers in our community to be of assistance, and they are selfless in their commitment. One of them who has been active for many years and whose voluntary work, help and outreach has been exceptional is Jacob Daskal. . . .  He will always make himself available, with only one stipulation that his involvement and personal contribution remain anonymous."  Ex. C, Rabbi Ben Zion Halberstam Ltr. at 1-2.  The Rabbi vividly highlights a number of examples—just a handful of instances of the many—in which Jacob's charity was instrumental.  One recent example, shortly prior to Jacob's arrest in the federal case, stands out:

> During COVID many people unfortunately passed away. One of the special people in our community who died was a young father, ███████. His death was sudden and he left 7 orphans. Jacob was at the forefront to raise money to create an endowment fund for his broken wife to be able to survive and feed her children. Today, these children are doing very well, and their mother is able to cope and look forward. Arrangements have been able to help with the tutoring for their studies, which is usually done by the father.

*Id.* at 2.

In his interpersonal life, Jacob also exemplifies generosity of spirit.  His reliable help to Chana Wider, who fled from Israel with her children to escape an abusive husband, is but one example.  When Chana arrived in Brooklyn, she and her children had nothing: "We were very tight financially and completely stressed and in very difficult days, unable to pay for rent and food."  Ex. C, Chana Wider Ltr. at 1.  Chana recalls how Jacob personally assisted Chana and her family.  "Jacob Daskal, came into our lives to the help of my family. . . . Jacob got to know our situation

15

and got involved to help us. He took care that the children should not feel lack of food or clothing." *Id*. Chana recounts that "[w]hether in the rainy season or the heat of summer, Jacob made sure we had food. He would personally bring a regular basket of food so that my children shouldn't lack anything. He and his wife, Bella, regularly hosted me and all the children on Sabbaths and festivals so that we would not sit alone." *Id.* Chana and her children are now on sound footing, and permanently resettled in the United States. She credits her family's financial security to Jacob's assistance: "Jacob, literally, saved the lives of me and my children. Since those times of despair and darkness, the worst that could be experienced by my family, Jacob has been, and continues to be, there for us . . . . I am truly blessed that Jacob and his wife and family came into our lives – without his help we would've been thrown onto the street." *Id.*

Jacob's employee, Tony, a veteran of the Marine Corps, who was injured during his military service, writes of Jacob's similar generosity in helping Tony find reliable employment, after years of turmoil. Tony described that "[e]ven though it is 25 years" since he left the Marines, it "is still hard to be out of service and my life has not been easy, especially to find a regular and decent job." Ex. C, Anthony Tompkins Ltr. at 1. But Jacob gave him a chance to build a stable life with a dependable job. In 2014, Jacob hired Tony "to replace the super of a building that he manages in Borough Park, 4701 12th Avenue," and "Jacob recommends [Tony] to a lot of other people as well, so that [he] can earn extra money." While Jacob and Tony have had their share of differences ("[w]hen we met, in those early days every second day we seem to argue."), Tony knows that he can rely on Jacob:

> I must say that if I really need something, even like a tool, he will always try his best to get it for me. Jacob really looks out for me. There have been some times when I have been short on money, and if he has with him, he will lend me. He never pushes for payment and does never charge me any interest.

Ex. C, Anthony Tompkins Ltr. at 1.

Beyond Jacob's long track record of generosity with his time and money, his volunteer work was perhaps most remarkable on September 11, 2001.  Jacob risked his life, and volunteered to assist at Ground Zero, just after the towers collapsed.  It was one of the darkest hours for the City and the nation, and little was known of the safety situation.  But Jacob did not hesitate.  Jacob's daughter Rose remembers that:

> The planes had no sooner crashed into the Twin Towers and my father received a call, and he was on his way – a true first-responder. He tearfully kissed us goodbye not knowing what lay ahead. He was prepared to sacrifice his life and health to help others . . . .  To him, his life was not worth[]living if he was not giving.  He supplied and personally handed out gas masks so that other rescue workers at the scene can stay safe.  This story is just one among millions of others.

Ex. B, Rose Teitelbaum Ltr. at 1, 4; *accord* Ex. B, Chaya Bornstein Ltr. at 2 ("And then there was 9 / 11. I was in the 12th grade at the time and I remember how he spent days at Ground Zero. He was among the first responders and would come home covered with dust from head to toe.  After the first few days he would go down whenever he was needed.").

Rose observes that "[m]any of [her] father's actions are long forgotten."  Ex. B, Rose Teitelbaum Ltr. at 2.  That may generally be so.  But each of Jacob's contributions and sacrifices recalled here should remain central to the Court's determination of what sentence is truly "sufficient, but not greater than necessary" for Jacob Daskal.  A sentence at the low-end of the plea agreement is appropriate.

### B.    Jacob has Devoted Himself to Caring for his Sickly Wife and Elderly Mother

At this time in his life, Jacob's first priority is to his wife of more than 40 years, Bella.  Jacob and Bella have faced many of life's challenges in their decades together.  And as they age, Bella has developed several serious health problems.  She depends on Jacob's help and support as she battles her illnesses.  Specifically, in the last several years, Bella has survived ███████,

███████████████████████████.  She has relied on Jacob's care and devotion every step of the

way, telling the Court:



> On a personal note, Jacob has stood by me, supporting me through my heath
> challenges and medical issues; I had a severe bout with ████████. I did not think
> that I would get through it all, but it is now in remission. That involved ████████
> ████████████████ When I was hospitalized, Jacob did not leave my bedside. When
> I went to ████████████, Jacob would take me and wait for me. He takes me to
> all my hospital and medical appointments. In addition, I suffer from ████████████.
> I am often in pain and my mobility is impeded. Some days it is challenging to even
> get up and go out on errands or shopping. My bones are weak and I developed
> ████████████████. For years, I have been unable to lift packages and heavy pots
> in the kitchen. Since Jacob has been confined to the house he has been very helpful
> with the cooking and other chores that have proven too much for me. Before that,
> he would do all the grocery and other shopping.
>
> Additionally, since the advent of this case, I developed a ████████████ which
> necessitated my ██████████████████████████. Considering that my
> family has no history of ██████████████
> ██████████████████.

Ex. B, Bella Daskal Ltr. at 4.

Bella has never been without Jacob. Now that she is at her weakest, with her health

conditions mounting, the thought of managing without her partner in life—at least until she is an

elderly woman, but perhaps permanently—is almost too much for Bella to bear:

> [N]ow that [Jacob] faces sentencing and the horror of more than a decade of
> incarceration stands before him and our family, I am beside myself with fear and
> desperation. I walk around our apartment feeling a looming specter of deathlike
> emptiness, until I just want to scream in pain. I beseech you to help offer some
> relief to us and leniency to Jacob that you can by law.

Ex. B, Bella Daskal Ltr. at 1.

Jacob is also a mainstay in his mother's life.  She will surely suffer in his absence.  Jacob's

father passed away nearly two years ago, during the pendency of this case, leaving his mother,

who is well into her 80s, widowed and alone.  Although Jacob has been on home detention since

his father's passing, he has ensured that his mother gets the care and assistance she needs, even

when he cannot physically tend to her himself.  And, every single week, Jacob welcomes his

mother into his home with open arms so that she has a festive place to spend the Sabbath.  Jacob's

wife Bella details Jacob's superlative care for his mother:

> Jacob takes care of his elderly mother. She . . . is a holocaust survivor, and she lives
> in Williamsburg. He calls her every day. Some days he calls her multiple times, just
> to see how she is doing and if there is anything that she needs. Before this case he
> would take her to all her doctor and other appointments, as well as to do her
> shopping. She has regular physical therapy, and the transportation back and forth
> is very difficult and by car service that is often unreliable. Jacob's siblings don't
> readily have reliable transportation and their jobs do not allow them the flexibility
> that Jacob had. She comes to spend most of the Sabbaths (Friday evening to
> Saturday night) with us so that she can be surrounded by her children,
> grandchildren, great-grandchildren and great-great grandchildren, and Jacob waits
> on her.

Ex. B, Bella Daskal Ltr. at 4; *see also* Ex. C, Nechama Mueller Ltr. at 2 ("Just recently, one of our

married sons came to visit on a Friday afternoon. He observed Jacob standing in front of his house

as a car pulled up. Out came an elderly woman and Mr. Daskal threw his arms wide exclaiming,

'Mommy! I'm so happy you're here for Shabbos!' My son commented, 'He was truly excited! You

can tell that he really loves and respects his mother!'").

Jacob's incarceration will leave a gaping void in the lives of his ailing wife and frail mother.

The care he has shown them, and the help he provided during their times of need are likewise

factors warranting a sentence at the low-end.  *See United States v. Salvador*, No. 98-CR-484

(LMM), 2006 WL 2034637, at *5 n.7 (S.D.N.Y. July 19, 2006) ("family ties and responsibilities"

are relevant "as determining the "'history and characteristics of the defendant' as required by 18

U.S.C. § 3553(a)(1).") (quotation marks and citations omitted).

### C.   Jacob Overcame a Painful Childhood ████████████ to Become a Patient, Warm and Dependable Family Man

Jacob Daskal is the father of eight grown children, and grandfather to numerous

grandchildren.  His joys in life are his children and grandchildren—because of their youth, Jacob's

sudden absence will be inexplicably and indelibly painful. *See* Ex. B, Solomon Daskal Ltr. at 3

("My father is going to sit in jail, and it will be a terrible loss to my mother and the entire family. He is the central pillar of the family).

Although Jacob suffered as a child, he never let that impact his own children and grandchildren. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████s. *See* Ex. B, Barry Daskal Ltr. at 1. But when he became a father, Jacob endeavored to show his children the softness and compassion that he longed for from his own father. As Jacob's oldest son, Chaim, expressed, his father "is an exceptional human being who instilled a lot of good character traits in his children." Ex. B, Chaim Daskal Ltr. at 1; *see also See* Ex. B, Solomon Daskal Ltr. at 3 ("I have learned all my life's lessons from him - how to act, how to help others, how to give charity. I remember when I first went out to work, he would say to me: it's not easy out there. Life can be and is hard. If you need help, ask me."). Chaim explained that "[p]art of being the oldest in a large family was to be able to watch how [his father] disciplined my younger siblings." Ex. B, Chaim Daskal Ltr. at 1. When he disciplined his children, "[i]t was always with care and love. . . . Never did he do anything inappropriate or hyper-strict. His way was that of time and patience." *Id*. To this day, Jacob's patience way as a father is his children's north star as they have become parents themselves. Chaim relates: "as parents, we try to emulate that same care and love. Frankly, we are in awe how he did it so successfully with all eight children." *Id*.

Even with so large a family, Jacob was an exceptional father to all of his children. Jacob always made time for each of his children and grandchildren individually—each one feels like the only person in the world when they are with their *Zaidy* (grandfather in Yiddish). Jacob "has a bond with each grandchild and he makes each child feel like an only grandchild. He plays with them, reviews their schoolwork with them and listens to all their stories with full attention. In fact,

he is like their best friend." *Id*. at 2.  Jacob's daughter Esther tells the Court that "[a]ll of the children and grandchildren want to be with my parents, my father in particular, because he is always so filled with love and joy when family is around."  Ex. B, Esther Brody Ltr. at 2; Ex. B, Solomon Daskal Ltr. at 3 ("My father is so central to all of us that when my 18-month-old little boy sees my cell phone, he will try to grab it and says Zadie, Zadie (grandfather) as if he wants to call my father. When we take our children over there, the little ones are only too quick to go into his arms and to be held by him.").

Because of the strong bond that he has with his children and grandchildren, Jacob and has prioritized maintaining his close relationship with them; he has not allowed his home detention these last two and a half years interfere with his family relationships.  His home is always open to his children and grandchildren, who live nearby, and stop by frequently.  Jacob's daughter Pearl explains that she, her husband and their six children "are all extremely close to my father."  Ex. B, Pearl Dembitzer Ltr. at 2.  Pearl and her family:

> [L]ive only two blocks away, and my parents' home is almost an extension of my own, with my children spending nearly as much time there as in our own home. My father is an extremely involved grandfather. He helps the children with their homework, and is always available for a serious discussion, light banter, playing games, or anything they might need.

*Id*.

Jacob's daughter Esther also lives around the corner from Jacob and his wife.  And Esther's children also visit their grandparents' house routinely to review their homework, or enjoy a treat on a Shabbos morning:

> My husband and I and our family live just around the corner from my parents. The kids go to be with Zaidy and Bubby (grandpa and grandma in Yiddish) every Sabbath (Saturday) morning after services at 11:30 like clockwork every week. The only time that they skipped was when we went away for a weekend. My older children, walking on the way home from school, detour and go to visit him – either to chat (he's their best friend) or for help with homework or reviews. He is so much part of their lives.

Ex. B, Esther Brody Ltr. at 2; *accord* Ex. B, Bella Daskal Ltr. at 3 ("Many of the[ grandchildren] come to see him every day on their way home from school, as well as on the Sabbath.").

Of course, Jacob and his wife are fortunate to have so much time with their grandchildren. But the grandchildren are at least as lucky to have a grandfather around who is interested in their daily activities, wants help them navigate the difficulties they encounter in their young lives, reviews their homework with them, and plays with the babies while their parents run errands. *See* Ex. B, Bella Daskal Ltr. at 3 ("All our children are happily married with beautiful families of their own, and we are not only grandparents, but great-grandparents. Jacob always babysits when needed. It is fortunate that his office is downstairs in our house, so that if any of our children have doctor or other such appointments, Zaide (grandpa) makes himself available. He will get down on the floor and play games with them and give them their meals or treats, and as they grow older, they come to him for help with their studies and homework. Many of them come to see him every day on their way home from school, as well as on the Sabbath."). That kind of close relationship with a grandparent—knowing that a grandparent like Jacob is always available as a backstop—can have a lasting positive impact on a child's young life.

Jacob's impending imprisonment will forever alter his grandchildren's upbringing: all of a sudden, their *Zaidy* won't be there for them. Jacob's daughter Pearl conveys that each of her "six children are shocked and devastated at the thought that their dear, beloved Zeidy, who is the kindest, most wonderful person they know, could be incarcerated:"

> **Son –** ▮▮▮▮▮▮ is studying in yeshiva in Israel, calls my father each week. He weeps at the thought of losing his confidant and role model. "It can't be!" he says. "This can't be happening!"

> **Daughter –** ▮▮▮▮▮▮ inconsolable. "Zeidy is everything to me," she cries. "How am I going to get married, without Zeidy? What if he can't be at my wedding?" I can only cry along with her.

**Son –** ███████ is also studying in yeshiva in Israel, says, "I've been preparing special thoughts to share with Zeidy on my next visit home. If something happens to him, nothing will ever be the same again. No Shabbos, no Chanukah party, no Passover Seder, nothing."

**Son –** ███████ is trying to be strong, but his worry is consuming him. He is at a vulnerable age, and I am afraid for his emotional wellbeing.

**Daughter –** ███████ is bewildered at the change in our household, and has lost the spark in her eyes.

**Daughter –** ███████ As of now, she doesn't know about the threat hanging over our family. She is still carefree, and I shudder to think of what she will say when we tell her that her Zeidy won't be home for the foreseeable future. "

Ex. B, Pearl Dembitzer Ltr. at 2; *accord* Ex. B, Esther Brody Ltr. at 3 ("If my father has to go to jail, I just do not know how the children will react. . . . I can't even bear to think about the heartbreak of explaining to them that he won't be around.").

Jacob recognizes that his criminal conduct is to blame for his family's distress, and impending separation.  He acknowledges candidly that: "because of my actions, our family will never ever be the same."  Ex. A, Jacob Daskal Ltr. at 2.  Still, in determining what sentence is appropriate, the Court should nevertheless consider the pain that Jacob's family will face due to his absence during a lengthy period of incarceration.  The collateral consequence to Jacob's large family further warrants a sentence at the low-end of the plea agreement range.  *See, e.g., United States v. Sloane,* 308 F.R.D. 85, 88 (E.D.N.Y. 2015) (varying below the Guidelines at least in part based on the court's recognition that "any imposed incarceration will cause distress and difficulties to [defendant's] two sisters").

**V.      CONCLUSION**

For the reasons stated above, Defendant Jacob Daskal respectfully requests that this Court

impose a sentence at the low-end of the plea agreement range, which is sufficient but not greater

than necessary to achieve the goals of federal sentencing.

Dated:  September 27, 2023                      Respectfully submitted,
        New York, New York

                                                MEISTER SEELIG & FEIN PLLC

                                      By:  _____/s/_____

                                                Henry E. Mazurek
                                                Ilana Haramati
                                                125 Park Avenue, Suite 700
                                                New York, New York 10017
                                                hem@msf-law.com
                                                ih@msf-law.com

                                                *Attorneys for Defendant Jacob Daskal*